**Veronica CARIDAD, individually and on behalf of all others similarly situated, et al., Plaintiffs–Appellants,**

v.

**METRO–NORTH COMMUTER RAILROAD, Defendant–Appellee.**

Nos. 98–7825, 98–7837, 98–7855, 98–7857.

United States Court of Appeals, Second Circuit.

Argued April 5, 1999.

Decided July 30, 1999.

John R. Quinn, Bay Shore, N.Y. (Alan L. Fuchsberg, Andrew J. Carboy, Molly A. Hunter, Jacob D. Fuchsberg Law Firm, New York, N.Y.; Russell Adler, Law Student, St. John's University, on the brief), for plaintiffs-appellants.

Myron D. Rumeld, New York, N.Y. (Gregory D. Wong, Proskauer Rose, New York, N.Y., on the brief), for defendant-appellee.

Before: NEWMAN, WALKER, and SACK, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal primarily concerns the commonality and typicality requirements of Rule 23(a) of the Federal Rules of Civil Procedure. The specific issue is whether these requirements can be met in a Title VII action where the members of the proposed class challenge the subjective components of company-wide policies and procedures governing employee discipline and promotion. This issue arises on an appeal by several of the named plaintiffs in a proposed class action against Metro–North Commuter Railroad ("Metro–North") from the May 15, 1998, judgment of the District Court for the Southern District of New York (Jed S. Rakoff, District Judge). The judgment incorporated a prior ruling denying the Class Plaintiffs' motion for certification of a proposed class consisting of current and former African–American employees of Metro–North, and dismissed all claims, subject to a stipulation preserving the rights of some of the Plaintiffs to appeal the class ruling. In addition, Veronica Caridad, one of the named Plaintiffs, appeals only from that part of the judgment dismissing her individual claim of sexual harassment.

We reverse the District Court's judgment to the extent that it denied class certification. The Plaintiffs are challenging the delegation to supervisors, pursuant to company-wide policies, of the authority to make subjective decisions regarding employee discipline and promotion; under these circumstances the requirements of Fed.R.Civ.P. 23(a) can be satisfied, and are satisfied in this case. We affirm the District Court's dismissal of Caridad's individual claim because Metro–North has satisfied the requirements recently articulated by the Supreme Court for an affirmative defense to Title VII liability.

## Background

### I. Class Plaintiffs and Their Claims

The Class Plaintiffs are the named plaintiffs in two related actions consolidated by the District Court.[1] The proposed class consists of all African–American employees of Metro–North for the period from 1985 through 1996—an estimated 1,300 persons.

The Class Plaintiffs allege that Metro–North's company-wide policies for employee discipline and promotion delegate to department supervisors substantial authority to make discretionary decisions about discipline and promotion that is exercised in a racially discriminatory manner and has a disparate impact on African–American employees. Following extensive discovery, the plaintiffs moved for class certification pursuant to Rule 23. In support of their allegations of systematic disparate treatment and disparate impact, the Plaintiffs submitted a report prepared by Dr. Harriet Zellner, the testimony of a sociologist, the testimony of Metro–North's own officers, and anecdotal evidence. Dr. Zellner's report was based on various multiple regression analyses performed on data files provided by Metro–North. In opposition to the motion for class certification, Metro–North submitted the report of Dr. David Evans, which attacked the methodology and conclusions of Dr. Zellner.

#### (a) Disciplinary Policy and Procedure

Pursuant to some sixteen collective bargaining agreements, Metro–North's disciplinary system, the "Progressive Disciplinary System" or "PDS," applies to all of the approximately 5,000 union employees at Metro–North, wherever employed in the company. Metro–North's Labor Relations Department oversees the PDS. In addition, Metro–North trains the PDS hearing officers in day-long sessions coordinated by the Labor Relations Department, and the hearing officers receive an official Metro–North Hearing Officers' Manual.

1. Seven of the named plaintiffs have not appealed.

Pursuant to the PDS, a supervisor or manager may bring "charges" against a union employee for misconduct, including violations of Metro–North's policies, procedures, and safety rules. Approximately 400 supervisors and managers have the authority to bring such charges. The charges are investigated by a hearing officer who is responsible for gathering evidence and presenting it at a hearing where the employee is represented by his or her union. A transcript of the hearing is presented to the charging supervisor, who determines what, if any, discipline to impose. Union employees may appeal any sanction pursuant to the procedures set forth in the collective bargaining agreements and the Railway Labor Act, 45 U.S.C. §§ 152 et seq. An assistant director of the Labor Relations Department conducts an initial review of the appeal, and a three-member Special Board of Adjustment, chaired by a neutral arbitrator, conducts the final review.

In a 1994 memorandum, Metro–North's Affirmative Action Director, Stephen Mitchell, voiced concern about the high percentage of disciplinary cases involving people of color. Also in 1994, because African–American and female employees in one department had complained of discrimination by their supervisor, Mitchell proposed that Metro–North review the disciplinary activities in that department from 1992 to 1993 to determine "if protected class employees have been unfairly disciplined."

Nineteen of the twenty-seven named Plaintiffs allege that they were unfairly disciplined because of their race.

(b) Promotion Policy

Metro–North's declared policy for filling management positions is to promote from within its own ranks. Between 60 and 80 percent of management positions are filled in this manner. The declared promotion policy requires the posting of all open management positions. The Personnel Department oversees posting of positions, receives and reviews applications, and maintains job title guidelines and pay structure. Although the Personnel Department assembles a list of qualified applicants, the manager of the department with a vacancy makes the final decision. The manager is directed to hire the most qualified candidate, but no other instructions are given.

Several of the named plaintiffs allege that these policies are not strictly adhered to; in particular, they allege that positions are not always posted and, even when they are, that it is well known who will receive the position before it is posted. Furthermore, some positions are filled through exceptions to the posting requirements, which the plaintiffs allege contribute to racial bias in promotions. In addition, approximately 200 union positions at Metro–North, which are viewed as positions that might facilitate promotion to a management position, are not governed by the formal promotion protocol. Hiring decisions in these positions—labeled "partially excepted positions" and "agreement supervisors"—are left entirely to the individual manager's discretion; the Personnel Department does not participate in the hiring process. The named Plaintiff Joseph Kimbro applied for and was denied promotion to the partially excepted position of chief crew dispatcher. He alleges that Metro–North promoted four White employees, whom Kimbro had trained and all with less experience than he had, to this position.

Historically, Metro–North has been predominantly male and White, and the company's employment statistics show that African–Americans are not well-represented in management positions or in those positions in the Metro–North workforce from which promotions to management are made. Internally produced reports that Metro–North submits to the Federal Transit Administration show underutilization of African–Americans in five of the eight job categories applicable to Metro–North. Most striking, African–Americans could be expected, based on census figures for the

New York metropolitan area, to fill 58.8 percent of the skilled-craft jobs but in fact filled only 15 percent of such jobs.

### (c) The Experts' Reports

Based on the results of numerous multiple regression analyses, the Class Plaintiffs' expert, Dr. Zellner, concluded that the "effect of being black on number of disciplinary charges over the 1990–to–1994 period was positive and highly significant statistically." Similarly, she concluded that the effect of being Black on the likelihood of being promoted from 1985 to 1994 was negative to a degree that was highly significant statistically. Dr. Zellner's analyses were run on eleven computer files provided by Metro–North—one for each of the ten years from 1985 to 1994 (providing basic data such as job title, hire date, last promotion date, termination date, department, race, and sex) and one providing information on disciplinary proceedings. She describes how she attempted to isolate the effect of race on the likelihood of discipline:

> In order to estimate the net effect of being black on discipline over the 1990–to–1994 period, we first defined the dependent variable ... as the number of disciplinary charges recorded for each employee as of the end of this period. Next we obtained measurements on five variables—age, years with the company prior to 1990, years with the company from 1990 onwards, department, and union vs. management status—that we expected would affect an employee's chances, regardless of race, of becoming involved in the disciplinary process. We then estimated the effect of being black on number of disciplinary charges, controlling for these variables.

In assessing the effect of race on promotion, Dr. Zellner controlled for years of tenure, department, and union status.

Based on her analysis, Dr. Zellner concluded that Blacks, on average, faced .7 disciplinary charges, which was 3½ times the amount for Whites, who faced, on average, .2 disciplinary charges. According to Zellner, the probability of this occurring by chance is less than one in 10,000. Accordingly, she concluded that the estimated effect of race on being disciplined is highly significant statistically. The results of her regression analyses with respect to promotion were similar; being Black reduced an employee's likelihood of promotion by approximately 33 percent.

In opposition to class certification, Metro–North submitted a critique of Dr. Zellner's report prepared by its expert, Dr. Evans. Dr. Evans noted that Metro–North has decentralized disciplinary and promotion processes and that, "[a]s a result of this decentralization, an organization-wide pattern and practice of discrimination is ... implausible." Dr. Evans opined that Dr. Zellner's conclusions to the contrary resulted from "her failure to account for differences that arise by department and position as well as her failure to take into account any specifics of the situation at Metro–North."

Evans' primary criticism of Zellner's report is that her analysis was done on a company-wide basis and not on a position-by-position basis. He stated that her results are examples of the "fallacy of composition," i.e., that she had created a statistical illusion of disparity by aggregating data across many different job titles. Based on his analysis of the data, Evans concluded that the experiences of the named Plaintiffs were, "at best, typical of only a fraction of the Metro–North workforce." In particular, he pointed out that of 37 particular departments at Metro–North, no disciplinary action was taken in 25 of them during the relevant period. He also reported that in departments where disciplinary action had been taken, there was considerable variation from job to job. Significantly, Evans did not perform any regression analyses in reaching his conclusions; instead, he simply tallied numbers of disciplinary actions and made some basic comparisons.

Furthermore, Evans concluded that for two infractions that can be objectively documented—substance abuse and failure to remit—the higher rates of discipline of Blacks corresponded to the higher incidence of infractions by Blacks. Evans dismissed Zellner's findings on discipline, stating that her method "cannot show discrimination because blacks could, on average, work for supervisors who mete out more discipline to workers of all races, work in departments where all workers are more severely disciplined, or have committed more violations than whites."

With respect to promotion, Evans again cited Zellner's failure to perform a position-by-position analysis; in addition, he criticized Zellner for including "non-promotable positions" in her data pool, which, he contended, created the statistical illusion that Blacks are less likely to be promoted than Whites. He noted that the overall rates of promotion are 12.7 percent for Whites and 8.1 percent for Blacks. However, when he excluded jobs for which the promotion rate was less than one percent, he found little difference in promotion rates by race (20.3 percent for Whites versus 19.4 percent for Blacks).

In response to Evans' critique, Zellner prepared a supplemental report. The report argued that Evans "defin[ed] away" the possibility of a system-wide pattern of discrimination by taking that term to require either a centralized policy of discrimination or concerted action by all supervisors. Zellner also attacked what she characterized as arbitrary selection of data and Evans' failure to perform regression analyses on the data he considered. Furthermore, she prepared a department-by-department comparison of the number of job titles in which Blacks and Whites, respectively, had higher discipline rates. This analysis showed that Blacks had higher discipline rates in 48 positions, in which 4,266 people were employed. Whites, on the other hand, had higher rates of discipline in 21 positions, and only 543 employees were employed in those

positions. Zellner also performed department-by-department regression analyses to estimate the effect of being Black on the number of disciplinary charges within each department. In all departments, the effect of being Black was positive; in only one of the ten departments was the effect not statistically significant.

(d) The District Court's Decision

In August 1997, the District Court denied the Class Plaintiffs' request for class certification. *See Robinson v. Metro–North Commuter Railroad Co.,* 175 F.R.D. 46 (S.D.N.Y.1997). The Court found Dr. Zellner's report unpersuasive:

> [D]efendant has satisfied the Court that the plaintiffs' statistics, even taken most favorably to plaintiffs, cannot carry their burden here, because they fail to take account of the fact that different Metro–North positions have materially different individual rates of discipline and of promotion associated with them. Unless these differences are taken into account, plaintiffs' global statistics are meaningless. Conversely, when these differences are taken into account, no statistically significant racial disparities, either for discipline or promotion, can be established with respect to the great majority of positions at Metro–North. Thus, plaintiffs' statistics are inadequate to carry their burden of establishing commonality as to the company-wide class here sought to be certified.

*Id.* at 48 (citations omitted). The Court further found that the infirmities in the statistics were not cured by the affidavits submitted because they related only to each affiant's individual claim of discrimination. *See id.* at 48–49.

In addition, the Court noted a "more fundamental problem" with the Plaintiffs' attempt to demonstrate commonality:

> [E]ven while seeking certification of a company-wide class, [plaintiffs] concede that defendant's standardized, company-wide policies and procedures relating to discipline and promotion are (and were

at all relevant times) non-discriminatory.... Their claim is that discrimination enters the picture only because defendant does not strictly adhere to its own policies governing discipline and promotion, but, rather, delegates broad authority for decision-making in promotions and discipline to its management personnel. This alleged policy of overdelegation is of no moment, however, in the absence of any proof that it opens the door to generalized discrimination. Here, as mentioned, neither plaintiffs' statistics nor [their] sociological opinion meaningfully supports such an inference.

*Id.* at 49. For these reasons, the Court concluded that the Plaintiffs had failed to demonstrate commonality and typicality. The Class Plaintiffs moved for reargument; the District Court denied the motion during oral argument on Metro–North's motion for summary judgment on the individual claims of the named Plaintiffs.[2]

## II. Caridad

Veronica Caridad, an African–American woman, began working for Metro–North in September 1992; after completing her training, she worked as an electrician until April 1995, when she resigned. Caridad was the only female working her shift, which included 12 men.

Caridad alleges that from March through September of 1994, her male supervisor, Will Clarke, sexually harassed her. She alleges several episodes, which included unwanted sexual touchings. During her deposition, Caridad testified that after these incidents she found it difficult to do her job because she "didn't know when [Clarke] was going to do this," and "every day [she felt she] could be subject to" another attack. In addition, Caridad alleges that she was treated hostilely by her male co-workers: one allegedly told

her that "nobody cares what happens to you" and that she had "walked into a lion's den." She also stated that her work was unfairly criticized because of her sex.

Despite Metro–North's sexual harassment policy and the availability of procedures for lodging complaints, Caridad failed to report this harassment, at least initially. However, at a disciplinary hearing concerning her absenteeism, Caridad broke down, became very emotional, and complained of being sexually harassed. Caridad eventually spoke to Stephen Mitchell, Metro–North's Director of Affirmative Action, but she did not tell him the specifics of the attacks. Indeed, Caridad testified that although she complained that she was treated poorly, she never mentioned Clarke's sexual harassment to Mitchell. She further testified that she did not want Metro–North to investigate her complaints because she did not think an investigation would improve matters. She stated that she did not trust Metro–North or its equal employment office.

By letter dated February 10, 1995, Mitchell advised Caridad that, in light of her expressed wishes, he would not take further action until April. Despite Caridad's continued refusal to provide details about her harassment, Metro–North offered to transfer her to another shift; in addition, she was offered a service attendant position. Caridad declined the transfer, stating that she did not feel it would solve the problem because the other work site was also predominantly male.

On April 27, Caridad resigned from Metro–North. By letter dated May 11, Mitchell informed Caridad that "[b]ased on your failure to contact me regarding the investigation/resolution of your internal discrimination complaint, I am administratively closing your complaint as of today."

Based on these facts, Metro–North moved for summary judgment, arguing

---

**2.** The District Court dismissed all but five of the claims challenged by Metro–North. These claims were later settled and dismissed, subject to a stipulation preserving the right to appeal the denial of the class certification.

that it could not be held liable for sexual harassment because Caridad had refused to cooperate in its efforts to investigate her complaint. On January 15, 1998, the District Court dismissed Caridad's sexual harassment claim. The Court stated:

> [A]lthough Veronica Caridad complained of inappropriate physical contact and comments by co-workers and supervisors, she refused to cooperate with the investigation commenced by Metro–North into her allegations. Accordingly, even if these incidents could constitute harassment, the acts complained of cannot be imputed to Metro–North.

### Discussion

#### I. Class Certification

■ "Provided that the district court has applied the proper legal standards in deciding whether to certify a class, its decision may only be overturned if it constitutes an abuse of discretion." *Lundquist v. Security Pacific Automotive Financial Services Corp.*, 993 F.2d 11, 14 (2d Cir.1993) (citation and internal quotation marks omitted). However, we are "noticeably less deferential to the district court when that court has denied class status than when it has certified a class." *Id.* (citing *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993)).

■ The party seeking to certify a class bears the burden of demonstrating numerosity, commonality, typicality, and adequacy. *See* Fed.R.Civ.P. 23(a). Here, we are concerned with the commonality and typicality criteria. As courts have noted, these requirements "tend to merge" because "[b]oth serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence." *General Telephone Co. v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Before certifying a class, a district court must be persuaded, "after a rigorous anal-

ysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 161, 102 S.Ct. 2364.

■ Nevertheless, a motion for class certification is not an occasion for examination of the merits of the case. *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 570–72 (2d Cir.1982). As the Supreme Court has stated, "[N]othing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

In this case, the District Court denied the motion for class certification because it concluded that Metro–North's policy of delegating discretionary authority to supervisors to make certain employment decisions affecting discipline and promotion precluded a finding of commonality and typicality. The Class Plaintiffs, on the other hand, argue that it is this policy— the delegation to supervisors, pursuant to company-wide policies, of discretionary authority without sufficient oversight—that gives rise to common questions of fact warranting certification of the proposed class. The Class Plaintiffs contend that this policy (i) has resulted in a pattern and practice of racial discrimination and (ii) has a disparate impact on African–American employees at Metro–North.

■ Though proving that the grant of discretionary authority to supervisory employees either results in a pattern and practice of discrimination or affects one class of employees more harshly than others is likely to be extremely difficult, *cf. Woodbury v. New York City Transit Authority*, 832 F.2d 764, 771 (2d Cir.1987) ("Where challenged employment practices are decentralized and uncoordinated ... statistics, though relevant, may be less significant in demonstrating bias than where a single office makes all employment decisions.") (citation and internal

quotation marks omitted), the fact that the Class Plaintiffs challenge the subjective components of company-wide employment practices does not bar a finding of commonality under either the disparate treatment or disparate impact model. In *Falcon*, the Supreme Court noted that, under certain circumstances, disparate treatment cases challenging subjective decision-making processes could be certified as class actions. *See* 457 U.S. at 159 n. 15, 102 S.Ct. 2364 ("Significant proof that an employer operated under a general policy of discrimination conceivably could justify a class ... if the discrimination manifested itself ... in the same general fashion, such as through entirely subjective decision-making processes."); *Shipes v. Trinity Industries*, 987 F.2d 311, 316 (5th Cir.1993) (affirming class certification where supervisors had authority to make subjective personnel decisions and noting that "[a]llegations of similar discriminatory employment practices, such as the use of entirely subjective personnel processes that operate to discriminate, satisfy the commonality and typicality requirements"). And, it is beyond dispute that the disparate impact analysis may be applied to subjective, as well as objective, employment practices. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990–91, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). We see no reason to limit this principle to individual claims of disparate impact. Other courts have reached the same conclusion. *See, e.g., Barefield v. Chevron U.S.A., Inc.*, No. C 86–2427 TEH, 1987 WL 65054, at *3–*4 (N.D.Cal. Sept.9, 1987) (commonality found where managers made subjective employment decisions but were "controlled by uniform, centralized management organization" that oversaw a uniform promotion system and evaluation process).

■ Of course, class certification would not be warranted absent some showing that the challenged practice is causally related to a pattern of disparate treatment or has a disparate impact on African–American employees at Metro–North.

Where the decision-making process is difficult to review because of the role of subjective assessment, significant statistical disparities are relevant to determining whether the challenged employment practice has a class-wide impact. *See Barefield*, 1987 WL 65054, at *3 (citing cases); *cf. International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) ("Statistics showing racial or ethnic imbalance are probative ... because such imbalance is often a telltale sign of purposeful discrimination.... In many cases, the only available avenue of proof is the use of racial statistics ....") (citations and internal quotation marks omitted). Regardless of their ultimate persuasiveness on the issue of liability, the statistical report and anecdotal evidence submitted by the Class Plaintiffs are sufficient to demonstrate common questions of fact regarding the discriminatory implementation and effects of Metro–North's company-wide policies regarding promotion and discipline.

■ The District Court relied on the report of Metro–North's statistical expert, Dr. Evans, to conclude that the Class Plaintiffs' statistics were inadequate because they failed to take into account the fact that various Metro–North positions have materially different rates of discipline and promotion. Though Metro–North's critique of the Class Plaintiffs' evidence may prove fatal at the merits stage, the Class Plaintiffs need not demonstrate at this stage that they will prevail on the merits. Accordingly, this sort of "statistical dueling" is not relevant to the certification determination. *See, e.g., Krueger v. New York Telephone Company*, 163 F.R.D. 433, 440–41 (S.D.N.Y.1995). We conclude that the Class Plaintiffs' statistical evidence supports a finding of commonality on the issue of discipline with respect to those African–American employees who were disciplined while working in one of the 48 positions in which African–Americans are more likely to be disciplined than Whites. In addition, the statistical evi-

dence supports a finding of commonality on the promotion claim. The Class Plaintiffs submitted evidence that tends to establish that being Black has a statistically significant effect on an employee's likelihood of being promoted; indeed, being Black reduces an employee's likelihood of promotion by approximately 33 percent. In conducting her analyses, the Class Plaintiffs' expert controlled for various factors that one would expect to be relevant to the likelihood of disciplinary action and promotion. These statistical disparities are not insignificant. *Cf. Watson*, 487 U.S. at 994–95, 108 S.Ct. 2777. More detailed statistics might be required to sustain the Plaintiffs' burden of persuasion, *see Wards Cove Packing Company v. Atonio*, 490 U.S. 642, 650–55, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), but this report, in conjunction with the anecdotal evidence, satisfies the Class Plaintiffs' burden of demonstrating commonality for purposes of class certification.

▮▮▮▮ The Class Plaintiffs also satisfied their burden of demonstrating typicality, which, as noted, tends to merge with the commonality requirement. This criterion does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact "occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Krueger*, 163 F.R.D. at 442 (citation and internal quotation marks omitted). Nineteen of the named Plaintiffs allege that they have been subjected to discipline pursuant to Metro–North's company-wide "PDS" as a result of racial discrimination. The fact that two of these Plaintiffs admitted that they had committed the infractions giving rise to the challenged disciplinary actions does not defeat a finding of typicality; indeed, one of the claims levied by the putative class is that African–American workers are disciplined for violations for which White workers are not. For these Plaintiffs, the ques-

tion of whether Metro–North's system-wide PDS has resulted in a pattern and practice of discrimination or affects African–Americans more severely than other employees is central to their claims. Likewise, for the seven named Plaintiffs who alleged that they were not promoted as the result of racial discrimination, the question of whether Metro–North's policy of delegating discretion to department supervisors to make subjective decisions regarding employee promotions is administered in a racially discriminatory manner or has a disparate impact on African–American workers is crucial to their claims, as well as to those of the proposed class.

In deciding a certification motion, district courts must not consider or resolve the merits of the claims of the purported class. *See Eisen*, 417 U.S. at 177, 94 S.Ct. 2140. Here, the District Court credited Metro–North's expert evidence over that of the Class Plaintiffs. Such a weighing of the evidence is not appropriate at this stage in the litigation. Accordingly, we reverse the denial of class certification and remand the case for further proceedings. Those proceedings will include the District Court's consideration of whether the requirements of Rule 23(b) are met, a matter that the Court did not reach.

## II. Caridad's Claim of Sexual Harassment

On appeal, Caridad makes two arguments in support of her claim that the District Court erred in dismissing her sexual harassment claim based on her failure to cooperate in Metro–North's attempted investigation of her complaint. First, she contends that Clarke's sexual harassment subjected her to a constructive discharge, and that such a discharge is a "tangible employment action" for which the employer is strictly liable without regard to an affirmative defense, under the Supreme Court's recent decisions concerning employer liability for Title VII violations by supervisors, *see Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct.

2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Alternatively, she argues that even if her constructive discharge is not a tangible employment action, Metro–North cannot satisfy the standard articulated by the Court in *Ellerth* and *Faragher* for an employer's affirmative defense to strict liability under Title VII.

> In *Ellerth* the Supreme Court held that [a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth,* 524 U.S. at ——, 118 S.Ct. at 2270 (citation omitted); *see also Faragher,* 524 U.S. at ——, 118 S.Ct. at 2292–93.

■ Contrary to Caridad's assertion, constructive discharge does not constitute a "tangible employment action," as that term is used in *Ellerth* and *Faragher.* In determining when an employer may be held strictly liable for the discriminatory acts of its supervisory employees, the Court focused on the following language of the Restatement (Second) of Agency: "A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless: . . . (d) the servant . . . was aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) of Agency § 219(2) (1957). In searching for a principled limitation of the "aided by the agency relation" concept, the Supreme Court concluded that the requirement of a tangible employment action by the harassing supervisor would ensure that employer liability would be imposed without the possibility of an affirmative defense only where the employer is implicated in the harm visited upon the employee by his or her supervisor:

> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. . . . As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury. A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. But one co-worker . . . cannot dock another's pay, nor can one co-worker demote another. . . . The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.
>
> . . . . A tangible employment decision requires an official act of the enterprise, a company act. . . .
>
> For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. . . .

*Ellerth,* 524 U.S. at ——, 118 S.Ct. at 2269 (citation omitted); *see also Faragher,* 524 U.S. at ——, 118 S.Ct. at 2290–92. Co-workers, as well as supervisors, can cause the constructive discharge of an employee. And, unlike demotion, discharge, or similar economic sanctions, an employee's constructive discharge is not ratified or approved by the employer.

Moreover, the facts of *Ellerth,* where the plaintiff, like Caridad, did not complain of the harassment prior to quitting her job, indicate that constructive discharge is not a tangible employment action depriving

the employer of the availability of the affirmative defense to Title VII liability. Ellerth alleged that she had been constructively discharged as a result of sexual harassment by her supervisor, *see Ellerth,* 524 U.S. at ——, 118 S.Ct. at 2263; in remanding the case for a determination of whether the employer could make out an affirmative defense, the Supreme Court noted that "Ellerth has not alleged she suffered a tangible employment action at the hands of [her supervisor]." *Id.* at ——, 118 S.Ct. at 2271.

Thus, although we have stated in another context that "[w]hen a constructive discharge is found, an employee's resignation is treated . . . as if the employer had actually discharged the employee," *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987), constructive discharge is not a tangible employment action warranting the imposition of strict liability under the *Ellerth/Faragher* standard. Accordingly, we must determine whether Metro–North has demonstrated that it is entitled to the *Ellerth/Faragher* affirmative defense.

■■■ As noted above, in the absence of a tangible employment action, an employer can avoid liability for a supervisor's harassment of a subordinate if it demonstrates that (a) it exercised reasonable care in preventing and correcting any sexually harassing behavior and (b) the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities. Caridad asserts that there is no evidence that Metro–North exercised reasonable care to prevent Clarke's behavior and that her failure to file a formal complaint and assist in the investigation of her claims was not unreasonable under the circumstances.

■■■ An employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct. Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense. *See Faragher,* 524 U.S. at ——, 118 S.Ct. at 2293 ("While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense."); *see also Fierro v. Saks Fifth Avenue,* 13 F.Supp.2d 481, 491 (S.D.N.Y.1998) (noting that the existence of an anti-harassment policy with complaint procedure is "an important, if not dispositive, consideration"). It is not disputed that Metro–North had an anti-harassment policy with a procedure for filing complaints. Furthermore, the undisputed facts of Caridad's case indicate that Metro–North endeavors to investigate and remedy problems reported by its employees. Under these circumstances, Metro–North exercised reasonable care to prevent and correct sexually harassing behavior.

■■■ With respect to the second prong of the affirmative defense, Caridad asserts that it was reasonable for her to be hesitant in speaking about the events. We do not doubt that there are many reasons why a victimized employee may be reluctant to report acts of workplace harassment, but for that reluctance to preclude the employer's affirmative defense, it must be based on apprehension of what the employer might do, not merely on concern about the reaction of co-workers. Caridad's reasons are not based on a credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint. Her reasons for not complaining to her employer are insufficient to preclude summary judgment in favor of Metro–North. *See Faragher,* 524 U.S. at ——, 118 S.Ct. at 2293 ("[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable

care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense."). In creating the affirmative defense to vicarious liability for the acts of supervisors, the Supreme Court sought to "accommodate the principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees." *Faragher*, 524 U.S. at ——, 118 S.Ct. at 2292. Here, the facts reveal that Metro–North is entitled to an affirmative defense against Title VII liability for the alleged conduct of Caridad's supervisor.

### Conclusion

We reverse the District Court's judgment to the extent that it denied certification of the proposed class and affirm to the extent that it dismissed Caridad's sexual harassment claim.

WALKER, Circuit Judge, dissents in part:

I join in that portion of the majority's opinion that affirms the dismissal of the claims of Veronica Caridad. However, with respect to the majority's view that the district court erred in denying class certification, I respectfully dissent.

Although it is true that our court's review should be somewhat more probing when a district court denies class certification than when it grants it, *see Lundquist v. Security Pac. Automotive Fin. Servs. Corp.*, 993 F.2d 11, 14 (2d Cir.1993) (*per curiam*), our standard of review still remains one of abuse of discretion, *see id.; Johnpoll v. Thornburgh*, 898 F.2d 849, 852 (2d Cir.1990) (*per curiam*). The district court acted well within its discretion when it denied class certification in this case. It is the duty of a district court faced with the question of class-action certification to

scrutinize the available evidence, make factual findings where necessary and conduct "a 'rigorous analysis' to determine whether Rule 23(a) has been satisfied." *Sheehan v. Purolator. Inc.*, 839 F.2d 99, 103 (2d Cir. 1988) (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). The question that the district court had to decide in this case was whether plaintiffs had established common questions of law or fact sufficient to meet the commonality and typicality requirements of Rule 23(a). I do not believe that they did. Simply alleging that the proposed class was all employees of Metro–North, and that they were members of an identifiable group of persons based on race, is, of course, insufficient to meet Rule 23(a)'s commonality and typicality requirements. Instead, discrimination plaintiffs must identify a common policy or practice, to which they were all subjected, that resulted in discrimination. This is what the Supreme Court meant when it said in *Falcon* that

> Title VII prohibits discriminatory employment *practices*, not an abstract policy of discrimination, The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer.

*Falcon*, 457 U.S. at 159 n. 15, 102 S.Ct. 2364 (emphasis in original). As a matter of law, I cannot agree with the majority that Metro–North's practice of delegating personnel decisions—plaintiffs prefer to call it "overdelegation"—constitutes a policy or practice sufficient to satisfy the commonality requirement of Rule 23(a). In my opinion, the district court should not have considered both parties' expert reports at the class certification stage. Although this evidence would be relevant to a determination of the merits of plaintiffs' discrimination claim, it was not relevant to a determination of the propriety of certify-

ing a class. Plaintiffs have never argued that Metro–North, at the highest levels, has a hidden policy of discrimination that could be smoked out by showing disparate impact throughout the company. Plaintiffs have conceded that Metro–North does not have a policy of discrimination. Indeed, it is undisputed that the company has written *anti-discrimination* policies applicable to all departments. Plaintiffs contend instead that certain department managers violate these policies by discriminating, and that it is Metro–North's policy of delegating to these managers the authority to promote and discipline that renders Metro–North liable for discrimination. Given this theory of the case, the district court should have deferred consideration of the expert reports until it was time to consider the merits of the discrimination claim. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Schweizer v. Trans. Union Corp.,* 136 F.3d 233, 239 (2d Cir.1998). Even though the district court's consideration of this evidence was premature, however, the district court's ultimate conclusion that there was no common question of law or fact to plaintiffs' claims sufficient to meet Rule 23(a)'s commonality and typicality requirements should be affirmed.

I do not know whether there might be one or more groups of employees within particular departments at Metro–North, who were subjected to common discriminatory practices or policies by specific department heads, that might properly be certified as classes under Rule 23(a); the issue is not before us. But, in the absence of some affirmative practice leading to discrimination by Metro–North—beyond the quite normal management practice of delegating personnel responsibility to departmental managers under the umbrella of an established anti-discrimination policy—I do not agree with the majority that the commonality and typicality requirements of Rule 23(a) are satisfied and that company-wide class certification is warranted,

much less that the district court abused its discretion in denying it.

I respectfully dissent.