Bravell **ARNOLD, Plaintiff,**

v.

**YALE NEW HAVEN HOSPITAL,**
**Defendant.**

**Civil Action No. 3:99CV1853(CFD).**

United States District Court,
D. Connecticut.

July 12, 2002.

Steven D. Jacobs, Jacobs, Jacobs & Shannon, PC, New Haven, CT, for plaintiff.

Kevin C. Shea, William H. Clendenen, Jr., Patrick M. Noonan, New Haven, CT, Bruce P. Matzkin, Delaney, Zemetis, Donahue, Durham & Noonan Concept Park, Guilford, CT, for defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DRONEY, District Judge.

### I.  Introduction

The plaintiff, Bravell Arnold ("Arnold"), brings this employment discrimination action against his employer, Yale–New Haven Hospital ("Yale–New Haven").[1] The amended complaint includes four claims: (1) sex discrimination in violation of the Civil Rights Acts of 1964 and 1991, 42 U.S.C. § 2000e*et seq.* ("Title VII"); (2) sex discrimination in violation of the Connecticut Fair Employment Practices Act, Conn. Gen.Stat. § 46a–60 *et seq.* ("CFE-PA"); (3) breach of the implied covenant of good faith and fair dealing; and (4) negligent infliction of emotional distress[2]. Yale–New Haven has moved for summary judgment on all claims of the complaint. For the following reasons, its motion is granted.

1.  The original complaint also named Jane Krueger, but she was not included as a defendant in the Amended Complaint that the Court permitted on November 15, 1999. The operative complaint is the Amended Complaint filed on May 3, 2000.

2.  Arnold filed a complaint with the Equal Employment Opportunities Commission and received a right to sue letter on January 23, 1999.

3.  The facts in this section are taken from the parties' Local Rule 9(c) statements and the materials attached to their memoranda, including the depositions of the plaintiff and

### II.  Factual Background[3]

Arnold began working as an environmental associate[4] at Yale–New Haven in 1994. He was assigned to Floor 6–2, the neurology unit, in early 1998. At that time, Jane Krueger ("Krueger") was a nurse on Floor 6–2. Although the parties dispute whether Krueger had the authority to make management or disciplinary decisions regarding Arnold, at oral argument they agreed that she should be considered one of Arnold's supervisors for the purposes of the instant motion.

Arnold testified at his deposition that Krueger began touching him in an offensive manner a few weeks after he began working on Floor 6–2. He stated that she "regularly touched my buttocks and my crotch," (Arnold Dep. at 23), approximately four to eight times a day, though the frequency of the incidents varied (*id.* at 93–94).[5] Arnold testified that when he objected to her conduct, Krueger would make statements such as "Shut up" or "Be quiet. Go back to school." (*Id.* at 96.) Krueger denied these incidents in her deposition, though she admitted hugging the plaintiff on one occasion and touching him on his arm when speaking with him. (Krueger Dep. at 51, 63–64.)

other Yale New–Haven employees. The facts are undisputed unless otherwise noted.

4.  Arnold explained at his deposition that as an environmental associate, he cleaned rooms, removed trash, and completed other related tasks, but that his job description was "unlimited." (Arnold Dep. at 18.)

5.  The Court recognizes that this description of the alleged harassment is taken principally from Arnold's own deposition testimony. Given that Yale–New Haven moves for summary judgment on the basis of its vicarious liability affirmative defense, the Court need not determine at this time whether these incidents actually occurred.

The parties also dispute the duration of Krueger's alleged conduct. Arnold testified that it continued for approximately two to three months, culminating in an incident with a broomstick on or about May 1, 1998. On that day, Arnold was attempting to remove a butterfly from a patient's room by guiding it out of a window with a dust mop. (Arnold Dep. at 98.) He had difficulty opening the window and was about to step onto an object, apparently to gain leverage, when Krueger "slammed and shoved the broom in [his] rectum" a little less than a inch. (*Id.* at 99.) Although Arnold did not know it then, another employee witnessed the incident.

Plaintiff then complained of Krueger's alleged harassment to his supervisor, Judy Grant ("Grant"). The parties dispute when he made this complaint. Arnold testified that he met with Grant a few days after the broomstick incident, while Yale–New Haven contends that he first did so on July 8, 1998, over two months later. There is no dispute, however, that Arnold made his first complaint about Krueger's conduct after the broomstick incident. At some point after Arnold met with Grant, they met with Lina Perrotti, Yale–New Haven's Manager of Personnel Relations, who then met with Krueger. Perrotti testified that Krueger did not admit or deny the incident at that time. (Perrotti Dep. at 57.) Once Arnold reported the incident to Grant, he never worked with Krueger again. Yale–New Haven decided Arnold's complaint was valid and discharged Krueger on July 14, 1998.[6] (Perrotti Dep. at 20.)

In August 1997, Al Kitchens, another environmental associate had made complaints of a similar nature against Krueger. (*Id.* at 26, 45.) Arnold apparently was aware of Kitchens' allegations before the "broomstick incident," (Arnold Dep. at 101), and appears to claim that Krueger threatened Arnold by asking him whether he saw what happened to his "buddy" Kitchens ( *id.* at 41).[7] It is not clear what "happened" to Kitchens; the only evidence presented of an adverse employment action against him is Arnold's statement that Kitchens began "washing dishes" after he complained about Krueger. (*Id.*) It is undisputed, however, that Krueger and Kitchens were referred to the "Consulting Pairs Program," an internal Yale–New Haven program which addresses interpersonal issues between employees, and Krueger was reminded of the sexual harassment policy. (Perrotti Dep. at 43–44.) A warning also was placed in Krueger's file, an action that changed her employment relationship with Yale–New Haven by preventing her from transferring in-house, and negatively affecting her performance evaluations. (*Id.* at 76–77.)[8]

The parties dispute whether Arnold was offered an in-house transfer shortly after his complaint about Krueger, though he eventually was transferred to another department. The parties agree, however, that Arnold has remained employed at

**6.** In paragraph 8 its Local Rule 9(c)(1) Statement, the defendant contends that it reached this decision "[f]ollowing an investigation which lasted less than a week." In the plaintiff's Local Rule 9(c)(2) Statement, Arnold states that "[s]o much of paragraph 8 as states '[f]ollowing an investigation which lasted less than a month' is denied." It is not clear whether this discrepancy is merely a typographical error, or whether the plaintiff objected to the statement because he believed the defendant to be contending that the investigation lasted nearly a month.

**7.** Because the Court was not provided with the entire relevant excerpt of Arnold's deposition, it is difficult to determine Arnold's understanding of the Kitchens incident.

**8.** Perrotti explained in her deposition that there were other complaints about Krueger, but they did not concern alleged sexual harassment. (Perrotti Dep. at 26.)

Yale–New Haven since the incident and has received "normal" raises.[9]

Yale–New Haven's sexual harassment policy includes the following language:

IV. Procedure

A. If an employee believes that he or she is the victim of sexual harassment, the employee should:

1. Directly inform, if possible, the person(s) engaging in the sexual harassing conduct or communicate that such conduct is offensive and should stop.

2. If the alleged harassment continues, the employee should contact his/her supervisor regarding the incident or the behavior. The complaint should identify the person(s) alleged to have committed the sexual harassment with all pertinent facts and information to facilitate an investigation and should be submitted within seven (7) working days of the alleged incident or pattern of behavior. If the alleged harassment originates with the employee's supervisor or manager, then the complaint should be raised with the manager to whom the supervisor or manager reports so that a responsible investigation can be made.

(Ex. C, Memo. Support Def.'s Mot. Summ. J.) Perrotti testified that the policy was posted in various places throughout the hospital, and that new hires were informed of it during orientation. (Perrotti Dep. at 34.) Arnold concedes that he was aware of the sexual harassment policy, and testified at his deposition that he knew he should have reported the alleged harassment before the broomstick incident, but that he failed to do so.

III. *Standard*

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . ." *Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban Propane v.*

---

**9.** It is not clear what types of raises are considered "normal," though Arnold explained at his deposition that Yale–New Haven employees generally receive some sort of raise each year "unless you're just a complete screw up." (Arnold Dep. at 63.) He also stated that his raise was smaller since the incident. (*Id.* at 62.) *But see* note 10, *infra.*

*Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992). Additionally "[w]here, as here, the nonmovant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing out an absence of evidence to support an essential element of the non-movant's case." *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 270 (2d Cir.1999) (citing *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548 and *Tops Mkts.,Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 95 (2d Cir.1998)).

## IV. *Discussion*

### A. *Title VII*

Title VII provides that "[i]t shall be unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Arnold alleges that Yale–New Haven violated Title VII in two ways: it subjected him to a hostile work environment and it retaliated against him for reporting the Krueger harassment. Each will be examined below.

### 1. *Hostile work environment*

Conduct prohibited by Title VII includes "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To prevail on a hostile work environment claim, a plaintiff must "establish (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Richardson v. New York State Dep't of Correctional*

*Serv.,* 180 F.3d 426, 436 (2d Cir.1999) (quotations omitted).

As to the first prong of this test,

Title VII does not authorize a hostile work environment claim for conduct that was merely offensive, rather than sufficiently "severe or pervasive" that a reasonable person would find the environment hostile or abusive. *See, e.g., Harris v. Forklift Systems,* 510 U.S. at 21, 114 S.Ct. 367; *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.").

[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the harm abusive. But while the psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris v. Forklift Systems, Inc.,* 510 U.S. at 23, 114 S.Ct. 367.

*Fitzgerald v. Henderson,* 251 F.3d 345, 356–57 (2d Cir.2001). Here, Yale–New Haven moves for summary judgment on the basis of its affirmative defense concerning vicarious liability and thus neither party has addressed whether Arnold was subjected to a hostile work environment. Accordingly, the Court will assume for the purposes of deciding the motion that

Krueger's treatment of Arnold was sufficiently "severe or pervasive."

As to the second prong required for a hostile work environment claim-that a specific basis exists for imputing to the employer the conduct that created the hostile environment-an employer is presumed vicariously liable under Title VII when the victim's supervisor created the hostile work environment. *Faragher v. Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In this case, the defendant concedes that Krueger should be considered as one of Arnold's supervisors for the purpose of considering the motion for summary judgment. An employer may still rely upon an affirmative defense to such a hostile work environment claim, however, if the employer did not take any tangible employment action against the employee in connection with the harassment. *Id.; Fitzgerald,* 251 F.3d at 357. A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington,* 524 U.S. at 761, 118 S.Ct. 2257.

■ Arnold has not produced evidence sufficient to raise a genuine issue of fact as to whether he suffered a "tangible employment action." As an initial matter, a "tangible employment action taken by the [harassing] supervisor becomes for Title VII purposes the act of the employer." *Ellerth,* 524 U.S. at 762, 118 S.Ct. 2257; *Caridad,* 191 F.3d at 294. Here, Arnold does not offer any evidence that Krueger herself took any tangible employment action against him. In his brief in opposition to Yale New–Haven's motion for summary judgment, Arnold claims that he was "singled out to work multiple floors in a single shift whenever there was a staffing shortage" and that "[h]e was not promoted to a position in unit service management, even though the quality and quantity of his service as an environmental associate at the hospital since 1994 qualified him for the position." Not only do these allegations fail to implicate Krueger, but the evidence indicates that Yale–New Haven took several steps to accommodate his requests after he reported Krueger. Perrotti explained that after Arnold reported to her that he felt the nurses were treating him differently following Krueger's discharge, he requested a transfer from Floor 6–2 and she took several steps to "negotiate a transfer." (Perrotti Dep. at 51–52.) For instance, she waived a requirement that employees such as Arnold who had previous warnings in their files for attendance problems could not be transferred to a different position, referred him for the position, was helpful in supporting his candidacy, and that he eventually took the position. (*Id.* at 52–53.) As to his allegation that he presently works multiple shifts more frequently since the incident, (Arnold Dep. at 52), Arnold's bare subjective perception is not sufficient to support a claim that the employment action was adverse. *Bunis v. Runyon,* No. 94 Civ.2063(JFK), 1997 WL 639241, at *3 (S.D.N.Y. Oct.16, 1997) ("Plaintiff's subjective feelings about the denial [of a request for a shift change] are not enough to transform the denial into an [adverse] employment action within the meaning of Title VII.").[10]

If there was no tangible employment action, as here, the employer still has the burden of proving the following to avail itself of the affirmative defense: "(a) that

---

**10.** The Court also notes that although Arnold stated at one point during his deposition that his annual raises have been smaller since the incident, the parties agreed in their Local Rule 9(c) statements that his raises have been normal.

the employer exercised reasonable care to prevent and correct promptly the sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Burlington,* 524 U.S. at 765, 118 S.Ct. 2257; *see also Leopold v. Baccarat, Inc.,* 239 F.3d 243, 245 (2d Cir.2001). An employer "need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct." *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 295 (2d Cir.1999). "Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense." *Id.* "The employee may then rebut the employer's proof by showing that the sexual harassment policy is not effective, which can be demonstrated, for example, by evidence that the employer did not disseminate its policy to its employees." *O'Dell v. Trans World Entertainment, Corp.,* 153 F.Supp.2d 378, 386 (S.D.N.Y.2001).

An employer is not entitled to summary judgment on the basis of its response to a complaint of prohibited discrimination "[i]f the evidence creates an issue of fact as to whether [its] action [wa]s effectively remedial and prompt." *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 441 (2d Cir.1999) (quoting *Gallagher v. Delaney,* 139 F.3d 338, 348 (2d Cir.1998)). Under certain circumstances, however, it is appropriate for the court to decide on summary judgment whether an employer exercised reasonable care. In *Caridad,* for example, the Second Circuit explained upon review of a district court's granting of an employer's motion for summary judgment,

It is not disputed that Metro–North had an anti-harassment policy with a procedure for filing complaints. Furthermore, the undisputed facts of Caridad's case indicate that Metro–North endeavors to investigate and remedy problems reported by its employees. Under these circumstances, Metro–North exercised reasonable care to prevent and correct sexually harassing behavior.

*Caridad,* 191 F.3d at 295. *But see Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 72 (2d Cir.2000) ("However, we have held that if harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate."). In addition, when an employer has an anti-harassment policy and provides a copy of the policy to the employee, those actions are important in determining whether the employer acted "reasonably" within the meaning of the affirmative defense. *See Smith v. American Int'l Group, Inc.,* No. 01 Civ. 1652(LAK)(FM), 2002 WL 745603, * 7 (S.D.N.Y. Apr. 26, 2002).

As to the second prong of the affirmative defense which requires the employee to take advantage of the employer's anti-harassment program,

Once an employer has satisfied its initial burden of demonstrating that an employee has completely failed to avail herself of the complaint procedure, the burden of production shifts to the employee to come forward with one or more reasons why the employee did not make use of the procedures. The employer may rely upon the absence of such a justification in carrying its ultimately burden of persuasion.

*Leopold,* 239 F.3d at 246. "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint

procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher*, 524 U.S. at 807–808, 118 S.Ct. 2275.

Here, Yale–New Haven exercised reasonable care in preventing sexual harassment and correcting promptly Krueger's harassment of Arnold. It had a written sexual harassment policy that provided specific complaint procedures. Yale New–Haven also promptly acted to address Krueger's harassment of Arnold as soon as Arnold made Grant aware of it. Grant set up a meeting with Perrotti within a week of the complaint. (Arnold Dep. at 32.) On July 14, 1998, Perrotti met with Krueger and informed her that she should resign or else she would be discharged. (Perrotti Dep. at 20.) The precise time frame between Arnold's complaint to Grant and Krueger's discharge, however, is not clear. Even assuming-as Arnold contends-that two months elapsed between Arnold's first complaint and Krueger's discharge, however, that delay was not unreasonable, particularly since it is undisputed that Arnold did not work with Krueger since he reported the harassment.[11] (Arnold Dep. at 101.)

Further, Yale–New Haven has satisfied its burden to show that Arnold unreasonably failed to take advantage of Yale New–Haven's complaint procedures. Arnold admitted at oral argument that although he was aware of Yale–New Haven's sexual harassment policy, he failed to avail himself of it before the broomstick incident. He did not report the prior inci-

dents of harassment by Kruefer to anyone, including his supervisors or Yale–New Haven's personnel relations office. Since Yale–New Haven had adopted and disseminated an anti-harassment policy which could have dealt with the prior harassment and most likely would have prevented the broomstick incident, it can hardly be held responsible for conduct of Krueger not reported to anyone. Thus, Yale–New Haven's response must be measured from the point at which Arnold first reported Krueger to Grant. Its response was swift and complete: the almost immediate termination of the offending employee. Therefore, both prongs of the affirmative defense are satisfied.

Arnold argues, however, that two factors should prevent the application of the affirmative defense. First, he contends that Yale–New Haven's reaction to Kitchens' prior complaint indicates that it did not exercise reasonable care to prevent and correct promptly sexually harassing behavior of Krueger. According to the uncontroverted deposition testimony of Lina Perrotti, however, Yale–New Haven took appropriate steps to prevent future harassment after Kitchens' complaint. Despite the fact that Krueger denied harassing Kitchens, she and Kitchens were referred to the Consulting Pairs Program and Krueger was reminded of the sexual harassment policy. (Perrotti Dep. at 37, 44–45.) A warning also was placed in her file, an action that changed her employment status, prevented her from transferring, and negatively affected her performance evaluations. (*Id.* at 76–77.) Krueger and Kitchens also were placed on different work shifts.[12] (*Id.* at 45.) While

---

11. Krueger apparently took sick leave shortly after the broomstick incident. The Court notes that in the plaintiff's Local Rule 9(c)(2) Statement, he disputes whether Arnold "never had contact with Ms. Krueger again after he made his complaint to Mrs. Grant." (Defs.' Local R. 9(c) Statement, ¶ 9.) Howev-

er, Arnold clearly stated in his deposition that he did not work with Krueger after he reported the alleged harassment.

12. Perrotti also explained that Kitchens made additional complaints relating to Krueger, but that they concerned the residual effects of the

the plaintiff criticizes Yale–New Haven for failing to place Krueger on employment probation, Perrotti stated that "we don't put people on probation." (Perrotti Dep. at 76.) Thus, Yale took reasonable steps to prevent future sexual harassment. Although ·it may not have been ultimately successful because of Krueger's later conduct directed at Arnold, such success is not required. *Caridad,* 191 F.3d at 295. Otherwise, employers would never be able to avail themselves of the defense if a prior complaint involving the same offending employee had been made.

Arnold also maintains that he failed to follow the Yale–New Haven complaint procedures because "having been privy to what had happened to Mr. Kitchens after complaining about Ms. Krueger and having himself been threatened by Ms. Krueger with the same fate that had befallen Mr. Kitchens, [he] had a credible fear that his employment would be adversely affected if he were to make a similar complaint." An employer is not permitted to avail itself of this affirmative defense where the employee's reluctance to complain is attributable to a credible fear that a complaint would not be taken seriously or that the employee would suffer an adverse employment action as a result of filing the complaint. *Caridad,* 191 F.3d at 295. Here, however, Arnold has not produced evidence sufficient to produce a genuine issue of material fact as to whether he had a credible fear that he would be subjected to an adverse employment action. He testified that he thought that Kitchens was transferred to a position where he washed dishes, but there is no evidence that this was an *adverse* employment action. The only support for this proposition is Arnold's own subjective

belief that this transfer represented a demotion. He stated in his deposition that "I believe my job is better than washing dishes, you know. He was doing what I was doing, then he went to wash dishes." (Arnold Dep. at 41.) As stated above, an employee's subjective belief is not sufficient by itself to evidence an adverse employment action. Thus, Arnold has not created a genuine issue of material fact that he could satisfy his burden of production to come forward with one or more reasons why the employee did not make use of the procedures, and Yale–New Haven has satisfied its overall burden of showing that his failure to follow the procedures was unreasonable.

### 2. *Retaliation*

Under Title VII, "[i]t also ... [is] an unlawful employment practice for an employer to discriminate against any of his employees .... because [the employee] opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Fitzgerald,* 251 F.3d at 358 (quotations and citations omitted). To establish a prima facie case of retaliation, the plaintiff must show: (1) participation in a protected activity;[13] (2) the employer knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *McMenemy v. City of Rochester,* 241 F.3d 279, 282–83 (2d Cir. 2001); *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 134 (2d Cir.1999).

---

prior incidents and did not involve new behavior. (Perrotti Dep. at 45.)

**13.** Making informal complaints such as those to management is a protected activity under

Title VII. *Gonzalez v. Bratton,* No. 96 CIV. 6330(VM), 97 CIV. 2264(VM), 2000 WL 1191558, at 12 n. 4 (S.D.N.Y. Aug. 22, 2000).

Once a prima facie case is established, the burden of production shifts to the employer to show that a legitimate, nondiscriminatory reason existed for its action. *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001).

■ Neither party has addressed retaliation as a basis for the complaint in this case, but at oral argument Arnold stated that he was advancing such a claim with respect to his treatment following the incident with Krueger. Specifically, he appears to maintain that he is now frequently asked to work two floors in one day, is given double duty when there is a staffing shortage, was previously not promoted to a position in unit service management, and received the "cold shoulder" from nurses. An adverse employment action is defined as a "materially adverse change in the terms and conditions of employment." *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.1997). Although Krueger need not have been responsible for the retaliatory adverse employment action, as explained above in reference to the hostile work environment claim, there is insufficient evidence presented by Arnold to create a genuine issue of material fact as to whether Arnold suffered an adverse employment action in retaliation for his complaints about Krueger. Further, to the extent that he feels that he is working extra shifts and nurses are giving him the "cold shoulder," his subjective feelings are not sufficient to support his allegations that he was the victim of an adverse employment action by Yale–New Haven, without more.

### B. *CFEPA*

The parties agree that CFEPA claims are analyzed in the same manner as those under Title VII. *See Brittell v. Department of Correction*, 247 Conn. 148, 717 A.2d 1254, 1264 (1998). Therefore, given the disposition of the Title VII claims, Arnold's CFEPA claim also must fail.

### C. *Covenant of good faith and fair dealing*

At a hearing before this Court, the plaintiff conceded that this claim fails. Accordingly, it is dismissed.

### D. *Negligent infliction of emotional distress*

In light of the Court's ruling on the plaintiff's other claims, the Court declines to exercise jurisdiction over his claim of negligent infliction of emotional distress. *See* 28 U.S.C. § 1367(c) ("district courts may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction"). Although the district court has the discretion to retain jurisdiction, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point toward declining jurisdiction over the remaining state-law claims." *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 61 (2d Cir.1998) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). The Court concludes that declining jurisdiction over the remaining state law claim is appropriate here.

### V. *Conclusion*

For the foregoing reasons, the defendant's motion for summary judgment is GRANTED and the Clerk is directed to close this case.