Joseph MAZZEI, on Behalf of Himself
and All Others Similarly Situated,
Plaintiff,

v.

The MONEY STORE, et al., Defendants.

No. 01 Civ. 5694 (JGK).

United States District Court,
S.D. New York.

Dec. 20, 2012.

48

Mark S. Kaufman, The Law Offices of Mark S. Kaufman, Kenneth Foard McCallion, McCallion & Associates LLP, Neal Arthur Deyoung, Neal Deyoung, Paul Stewart Grobman, Paul Grobman, Esq., New York, NY, for Plaintiff.

Martin I. Kaminsky, Werner Hans Kobelt, Daniel A. Pollack, McCarter & English, LLP, New York, NY, for Defendants.

### OPINION AND ORDER

JOHN G. KOELTL, District Judge:

The plaintiff, Joseph Mazzei, brings this purported class action on behalf of himself and all others similarly situated against The Money Store, TMS Mortgage, Inc., and HomEq Servicing Corporation (collectively, "The Money Store defendants"). The plaintiff alleges breach of contract, violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1666d, TILA Regulation Z, 12 C.F.R. § 226.21, and California Business & Professional Code § 17200 *et seq.* (West 2011), in connection with the defendants' allegedly improper debt collection practices.[1] The plaintiff moves for class certification of a breach of contract class, a TILA class, and two California subclasses pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted.

### A.

In 1994, the named plaintiff, Joseph Mazzei, took out a home mortgage loan from The

---

**1.** Judge Sprizzo previously dismissed the plaintiff's claims under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605. *See Mazzei v. Money Store,* 349 F.Supp.2d 651, 661 (S.D.N.Y.2004) (dismissing the Fair Debt Collection Practices Act claim); *Mazzei v. Money Store,* 552 F.Supp.2d 408, 413 (S.D.N.Y.2008) (dismissing the Real Estate Settlement Procedures Act claim).

Money Store on his home in Sacramento, California. *Mazzei v. Money Store*, No. 01 Civ. 5694, 2011 WL 4501311, at *2 (S.D.N.Y. Sept. 29, 2011). The loan was issued pursuant to Fannie Mae form loan documents, including a Note and Deed of Trust (collectively, the "form loan agreement").[2] (Grobman Decl. ¶¶ 3–5.)

In December 1999, Mazzei began to experience financial difficulties and fell behind on his loan. *Mazzei*, 2011 WL 4501311, at *2. He defaulted on several occasions. *Id.* In or about March 2000, pursuant to the Deed of Trust, The Money Store defendants accelerated Mazzei's loan obligations and declared the full amount of the debt immediately due and payable. (Grobman Decl. Ex. MM at 189.) After Mazzei's loan was accelerated, he was charged several late fees, allegedly for his failure to make monthly payments. (Grobman Decl. Ex. E at 2881; Grobman Decl. Ex. MM at 189.) Mazzei filed for bankruptcy in July 2000. *Mazzei*, 2011 WL 4501311, at *2. In October 2000, Mazzei dismissed his bankruptcy petition and he alleges that he sold his home. (Dunnery Decl. Ex. K; Am. Compl. ¶ 33.) At that time, in an effort to satisfy his outstanding obligation to the defendants, Mazzei made a payment of $61,147.32. *Mazzei*, 2011 WL 4501311, at *2. That amount included payment for all attorneys' fees, late fees, and other expenses that the defendants allegedly had incurred as a consequence of Mazzei's defaults.[3] After the payment of $61,147.32, Mazzei contends that his loan was paid off in full, but the defendants claim that a small balance was left unpaid and was subsequently written off.[4]

**B.**

The Money Store defendants are mortgage lenders and servicers of mortgage loans. (Dunnery Decl. ¶ 1.) The defendants had outsourcing arrangements with a law firm, Moss, Codilis, Stawiarski, Morris, Schneider & Prior LLP ("Moss Codilis"), and a non-legal entity, Fidelity National Default Solutions ("Fidelity"), each of which are central to Mazzei's allegations that he was charged improper fees in connection with his default. (Dunnery Decl. ¶ 9.)

The Money Store defendants retained Moss Codilis to help manage collection efforts for loans that were in default. (Dunnery Decl. ¶ 9(a).) Moss Codilis, a law firm located in Colorado, sent breach letters to delinquent borrowers on loans serviced by the defendants (the "Breach Letter Program"). (Dunnery Decl. ¶ 9(a); Grobman Decl. ¶ 32.) From 1997 through 2000, Moss Codilis sent out 88,937 breach letters on behalf of the defendants. (Grobman Decl. Ex. Z. at 4.) Fees for these breach letters were charged to the borrowers' accounts pursuant to the form loan agreement provisions regarding attorneys' fees. (Dunnery Decl. ¶ 9(a).) On February 23, 2000, Moss Codilis sent a breach letter to Mazzei about his delinquent loan.[5] (Dunnery Decl. Ex. G.) On April 6, 2000, a fee of $35.00 for the breach letter was charged to Mazzei's account. (Dunnery Decl. ¶ 9(a); Grobman Decl. Ex. E at 2881; Grobman Decl. Ex. G at 3.)

The Money Store defendants also employed Fidelity to assist with bankruptcies and foreclosures. Fidelity, a non-legal enti-

---

**2.** On November 2, 1994, The Money Store transferred the Note and Deed of Trust to The Bank of New York. (Dunnery Decl. Exs. A, C.) The Money Store continued to service the loan on behalf of The Bank of New York throughout the relevant time period. (Dunnery Decl. ¶ 6.)

**3.** Mazzei's account was charged $255.00 in "Bankruptcy Attorneys' Fees," $461.47 in "Foreclosure Attorneys' Fees," and $1037.80 in "Bankruptcy Court Costs" and "Foreclosure Court Costs." (Grobman Decl. Ex. G at 3.)

**4.** There has been some dispute between the parties over whether the payment of $61,147.32 completely paid off Mazzei's account. The defendants allege that an outstanding balance of

$229.26 was written off on December 26, 2001. (Grobman Decl. Ex. G at 3–4.) Although resolution of the issue may be relevant for Mazzei's other claims, it is not relevant for this motion.

**5.** Although Mazzei received four breach letters from Moss Codilis over the time he was in default, the class period Mazzei asserts only includes the final breach letter sent on February 23, 2000. Mazzei's counsel admitted at oral argument that the only breach letter within the class period was the letter sent on February 23, 2000. Therefore, the propriety of the other breach letters, and the identity of the Breach Letter Program's supervisor during the period before the final breach letter, are not in dispute.

ty, had a national network of hundreds of law firms to which it would refer cases from The Money Store defendants for representation in foreclosure and bankruptcy proceedings. (Dunnery Decl. ¶ 9(c).) As of July 2005, the defendants had referred over 46,000 loans to Fidelity for foreclosure and bankruptcy matters. (Grobman Decl. Ex. Q at 9.) Under the agreement between the defendants and Fidelity, the law firms sent their bills to Fidelity as an intermediary. (Dunnery Decl. ¶¶ 9(c), 9(c)(iii); Grobman Decl. Ex. N at 13.) Fidelity would then bill the defendants. (Dunnery Decl. ¶¶ 9(c), 9(c)(iii).) After receiving invoices from Fidelity, The Money Store defendants paid Fidelity, which then passed on these payments to the law firms. (Dunnery Decl. ¶¶ 9(c), 9(c)(iii).) The law firms paid Fidelity a "technology and referral fee," allegedly for a software system which helped the law firms handle the matters Fidelity referred to them. (Dunnery Decl. ¶¶ 9(c), 9(c)(iii).)[6] The "technology and referral fee" paid by the law firms was included in the amount that Fidelity calculated for the Fannie Mae allowable limits on legal fees for bankruptcy and foreclosure actions. (Grobman Decl. Ex. K at 417.) The fee charged by Fidelity as an "attorneys' fee" included the amount that was paid to the attorneys as well as a technology and referral fee. The defendants claim that their policy was to delay charging the borrowers' accounts for attorneys' fees until after the defendants had already sent payment to Fidelity for the legal services. (Dunnery Decl. ¶¶ 9(c)(i), 18(e).)

Under a part of the agreement between The Money Store defendants and Fidelity (the "Bonus/Penalty Agreement"), if an individual foreclosure or bankruptcy was completed before a set deadline, Fidelity would receive a bonus payment from The Money Store defendants. (Dunnery Decl. ¶ 9(c)(ii).) However, if Fidelity failed to meet the deadline for the completion of an individual bank-

ruptcy or foreclosure, Fidelity had to pay the defendants a penalty. (Grobman Decl. Ex. A at 462–77; Grobman Decl. Ex. N at 19–21.) In instances where a penalty was assessed against Fidelity, the borrower was not paid back the portion of the funds that the defendants collected as a penalty. (Grobman Decl. Ex. A at 476–77.)

### C.

This action arises out of The Money Store defendants' alleged breaches of the form loan agreement. Mazzei purports to represent a class of individuals who were charged improper attorneys' fees and late fees in contravention of the form loan agreement. Specifically, the plaintiff asks the Court to certify one class consisting of:

> All similarly situated borrowers who signed [form loan agreements] on loans which were owned or serviced by [the defendants] and who from March 1, 2000 to the present ("Class Period") were charged the following fees that were not permitted under the [form loan agreements]:
>
> [1] attorneys' fees and expenses which [the Money Store defendants] never paid to [Fidelity] or their attorneys, including penalties paid back by Fidelity from attorneys' fees which were not credited to borrowers; and
>
> [2] amounts paid to Fidelity, a non-lawyer entity, from attorneys' fees charged to borrowers;
>
> [3] attorneys' fees improperly collected from borrowers for issuance of breach letters by [Moss Codilis]; and
>
> [4] late fees after the borrower's loan was accelerated, and where the accelerated loan was paid off (or foreclosed on).

(Pl.'s Mem. Supp. Class Certif. 1.)[7]

Subgroups [1], [2], and [3] rely on provisions of the form loan agreement regarding

---

6. Fidelity alternatively identified the "technology and referral fee" as an "administrative support fee" that law firms paid for each loan referred. (Grobman Decl. Ex. T.) For the purposes of this motion, the term "technology and referral fee" will be used to refer to any fee that was paid from law firms to Fidelity for the referral services Fidelity provided.

7. The class definition in the plaintiff's memorandum in support of class certification is clearer than the sprawling class definition in the Third Amended and Supplemental Complaint at ¶ 10. The Court had previously stricken a prior motion for class certification in part because the plaintiff had proposed a new class in response to the defendants' opposition to class certification. On this motion, the defendants do not contest that

attorneys' fees. The form loan agreement requires that the borrower pay all reasonable attorneys' fees the defendants incur in connection with a borrower's default, bankruptcy, or foreclosure. Specifically, the Note provides that upon default, "the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. These expenses include, for example, *reasonable attorneys' fees* ...." (Grobman Decl. Ex. B at ¶ 4(D) (emphasis added).) Similarly, the Deed of Trust allows for acceleration of the debt upon default and requires the borrower pay for reasonable attorneys' fees related to the default and acceleration:

> 7. Protection of Lender's Rights in the Property ... If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy ... ), then Lender may do and pay for whatever is necessary to protect the value of the property and Lender's rights in the Property ... Lender's actions may include ... paying *reasonable attorneys' fees* ... any amounts disbursed by Lender under this paragraph [ ] shall become additional debt of the Borrower secured by this Security Instrument ...
>
> 19. Acceleration; Remedies ... If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 19, including, but not limited to, *reasonable attorneys' fees* and costs of title evidence.

(Grobman Decl. Ex. C at ¶¶ 7, 19 (emphasis added).) Mazzei alleges that the defendants

the plaintiff has set forth accurately in his memorandum the class he seeks to represent, and therefore the Court will accept that class definition and deem the complaint amended to incorporate that class definition.

charged him and others several different types of improper "attorneys' fees."

Subgroup [4] focuses on a provision of the form loan agreement that allows the defendants to charge late fees for late monthly payments. Mazzei claims that he and other members of the class were improperly charged late fees after the defendants had already accelerated their loans ("Post–Acceleration Late Fees"). The Note provides that late fees may be charged if a monthly payment is late:

> If the Note Holder has not received the full amount of any of my monthly payments by the end of 10 calendar days after the date it is due, I will promptly pay a late charge to the Note Holder.[8]

(Grobman Decl. Ex. B at ¶ 4(A).) The Deed of Trust also provides that a borrower could have his or her loan reinstated despite a default and after acceleration by the lender, if the borrower, among other things, "pays Lender all sums which then would be due under this Security Instrument and the Note had no acceleration occurred...." (Grobman Decl. Ex. C. at ¶ 18.) The defendants allege that this provision allowed the defendants to charge late fees after acceleration of a loan if the borrower reinstated that loan. (Dunnery Decl. ¶ 18(b) n. 8.)

If the borrower did not reinstate the loan-that is, if the borrower paid off the loan or the loan was foreclosed on-the form loan agreement is silent with regard to whether the lender may charge late fees after the borrower has defaulted and the lender has accelerated the remaining debt. The defendants allege that it was their policy not to charge late fees after acceleration for loans in bankruptcy, (Dunnery Decl. Ex. N at 173), or for loans in which the underlying property was sold upon foreclosure (Dunnery Decl. Ex. N at 186–88). The defendants also claim that they had a policy of reviewing state laws regularly and only charging late fees after acceleration in those states where the form

8. The plaintiffs in *Vincent v. Money Store,* No. 03 Civ. 2876, had similar provisions in their contracts. (Grobman Decl. Ex. DD at ¶ 7(a); Grobman Decl. Ex. EE at ¶ 4(a); Grobman Decl. Ex. FF at ¶ 8(A).)

loan agreement had not been interpreted to prohibit such charges. (Dunnery Decl. ¶ 9(b); Dunnery Decl. Ex. N at 186–88.)

The form Deed of Trust also has a provision that requires the refund of any improper loan charges:

> If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then ... any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.

(Dunnery Decl. Ex. B at ¶ 12.) The plaintiff alleges that each of the improper fees must be returned because they are prohibited under the form loan agreement and/or exceed the permissible charges under the laws of all fifty states.

### D.

On June 22, 2001, the plaintiff filed his Complaint in this Court. On December 1, 2004, Judge Sprizzo granted summary judgment dismissing the plaintiff's claims under the Fair Debt Collection Practices Act but denied without prejudice the defendants' motion for summary judgment on the plaintiff's claims under TILA and the Real Estate Settlement Procedures Act. On April 25, 2008, Judge Sprizzo granted summary judgment on the plaintiff's claims under the Real Estate Settlement Procedures Act but again denied summary judgment without prejudice on the plaintiff's TILA claim. *See Mazzei*, 552 F.Supp.2d at 413. On September 29, 2011, this Court denied the defendants' motion for summary judgment on the plaintiff's claim under TILA. *Mazzei*, 2011 WL 4501311, at *3.

## II. STANDARD FOR CLASS CERTIFICATION

■ Before certifying a class, the Court must determine that the party seeking certification has satisfied the four prerequisites of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed.R.Civ.P. 23(a); *see, e.g.,* *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202–03 (2d Cir.2008); *In re Initial Pub. Offerings Sec. Litig.* ("*In re IPO*"), 471 F.3d 24, 32 (2d Cir.2006). The Court must find, more specifically, that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). The Court must also find that the class qualifies under one of the three sets of criteria set forth in Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Teamsters*, 546 F.3d at 203; *In re IPO*, 471 F.3d at 32.

■ The plaintiff here seeks certification under Rule 23(b)(3), which provides for a class to be maintained where "the questions of law or fact common to the class members predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). If the requirements of 23(a) have been met, and the claims fall within the scope of Rule 23(b)(3), a court may, in its discretion, certify the class. *See In re IPO*, 471 F.3d at 41 ("[A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met.").

■ "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). Plaintiffs seeking class certification bear the burden of demonstrating by a preponderance of the evidence that the proposed class meets each of the requirements for class certification set forth in Federal Rule of Civil Procedure 23. *Teamsters*, 546 F.3d at 202. When

assessing whether plaintiffs have met this burden, courts must take into account "all of the relevant evidence admitted at the class certification stage." *In re IPO,* 471 F.3d at 42. A court may certify a class only after determining that "whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *Id.* at 41. "[T]he obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue," although a court "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *Id.*

## III. DISCUSSION

## A. THRESHOLD CLASS–WIDE ISSUES

During the time between Mazzei's initial default in December 1999 and the final repayment of his mortgage loan in October 2000, the defendants charged Mazzei's account for various fees they incurred. Mazzei's October 2000 repayment of $61,147.32 included payment for these fees, many of which Mazzei now alleges were improperly charged. Mazzei seeks to represent a class of borrowers who were similarly subjected to improper fees. There are two threshold issues of class definition that must be addressed prior to analysis of whether the class action may be certified pursuant to Rule 23: (1) whether the proposed class definition creates a fail-safe class and (2) whether the class should be restructured.

## 1. FAIL–SAFE CLASS DEFINITION

 The defendants argue that the proposed class definition creates an impermissible "fail-safe" class. A fail-safe class is one whose definition "shields the putative class members from receiving an adverse judgment. . . ." *Randleman v. Fidelity Nat'l Title Ins. Co.,* 646 F.3d 347, 352 (6th Cir.2011); *see also Kamar v. Radio Shack Corp.,* 375 Fed. Appx. 734, 736 (9th Cir.2010) ("The fail-safe appellation is simply a way of labeling the obvious problems that exist when the class itself is defined in a way that precludes membership unless the liability of the defendant is established."). In a fail-safe class, either the class members win or, by virtue of losing,

they are not in the class, and therefore not bound by the judgment. *See Genenbacher v. CenturyTel Fiber Co. II,* 244 F.R.D. 485, 488 (C.D.Ill.2007). A proposed "fail-safe" class should not be certified because it is unfair to defendants, it prevents an adverse judgment being entered against plaintiffs, and it is unmanageable because the members of the class could only be known after a determination of liability. *See Randleman,* 646 F.3d at 352; *Kamar,* 375 Fed.Appx. at 736.

 The proposed class definition creates a fail-safe class. Mazzei has offered the following broad class definition:

> All similarly situated borrowers who signed form loan mortgage agreements . . . on loans which were owned or serviced by [the defendants] and who from March 1, 2000 to the present ("Class Period") were charged the following fees *that were not permitted under the [form loan agreements]:*

(Pl.'s Mem. Supp. Class Certif. 1 (emphasis added).) Defining the class to include only those who were charged fees "that were not permitted" results in a fail-safe class. The merits of Mazzei's claim depend on whether the fees "were not permitted." With the current class definition, if the trier of fact decided that any or all of the fees were permitted under the form loan agreements, there would immediately be no members of the class for those fees. The language "were not permitted" defines the class impermissibly by the very liability the plaintiff seeks to establish.

Despite a fail-safe class definition, courts have the discretion "to construe the complaint or redefine the class to bring it within the scope of Rule 23. . . ." *Cokely v. N.Y. Convention Ctr. Operating Corp.,* No. 00 Civ. 4637, 2004 WL 1152531, at *2 n. 3 (S.D.N.Y. May 21, 2004) (quoting 7A Wright & Miller, Fed. Prac. & Proc. Civ.2d § 1759 (2003) (citations omitted)); Fed.R.Civ.P. 23(c)(1); *see also Campbell v. First Am. Title Ins. Co.,* 269 F.R.D. 68, 73–74 (D.Me.2010) (revising the class definition to avoid "the 'fail safe' issue"). By removing the troublesome language "that were not permitted under the

[form loan agreements]," the fail-safe problem is partially resolved.[9]

## 2. DIVIDING THE CLASS INTO FIVE POSSIBLE CLASSES

■ The next threshold issue is whether the single class offered by the plaintiff should be split into separate classes. "[C]ourts ha[ve] discretion to create additional classes or split a class into subclasses, as long as each individual class satisfies the prerequisites of Federal Rules of Civil Procedure 23(a) and 23(b)." *In re Nanophase Techs. Corp. Litig.*, Nos. 98 C 3450, 98 C 7447, 1999 WL 965468, at *2 (N.D.Ill. Sept. 30, 1999) (citations omitted); *see also Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 391 n. 2 (C.D.Cal.2008) (citing Wright, Miller & Kane, 7A Fed. Prac. & Proc. Civ. § 1759 ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of Rule 23.")). Mazzei initially proposed the class action as one breach of contract claim class, with each subgroup constituting a subclass of the same breach of contract claim class. The class was defined as including those individuals during the Class Period who were charged the fees specified in categories 1 through 4, and 5. By its definition, to be a member of the class, an individual had to be charged each of the fees that were alleged to be in violation of the form loan agreement. However, at oral argument, Mazzei conceded that the class could be divided into separate classes rather than be treated as one breach of contract class action. The breaches described in each of the subgroups depend on distinct factual allegations. If the subgroups were analyzed as parts of one class under Rule 23, there would be glaring problems of commonality, typicality, and adequacy under Rule 23(a), as well as issues of predominance and superiority under Rule 23(b). *See, e.g., Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 226 F.R.D. 446, 451 (S.D.N.Y.2005) (holding that class failed predominance requirement because members alleged same contract was breached in a number of different ways). Therefore, the subgroups will be treated as separate classes, and each such class will be required to meet all of the elements of Rule 23.

Furthermore, although Mazzei divided the class action into four subgroups, it is apparent that the class definition calls for the creation of five separate classes. The first subgroup Mazzei proposed included two distinct factual allegations: (1) fees were allegedly charged by the defendants that were never paid to attorneys at all, and (2) fees were allegedly charged by the defendants, paid to attorneys, refunded to the defendants, yet never returned to the class members. Because these groups do not necessarily overlap, the subgroup will be divided into separate classes. Keeping as much of Mazzei's originally proposed language as possible, the following five classes result:

> All similarly situated borrowers who signed form loan mortgage agreements on loans which were owned or serviced by the defendants and who from March 1, 2000 to the present ("Class Period") were charged:
>
> (1) attorneys' fees improperly collected from borrowers for issuance of breach letters by Moss Codilis ("Breach Letter Fee Class");
>
> (2) attorneys' fees and expenses which the defendants paid to Fidelity but which were paid back to the defendants by Fidelity as penalties from attorneys' fees and which were not credited to borrowers ("Penalty Fee Class");
>
> (3) attorneys' fees and expenses which the defendants never paid to Fidelity or their attorneys ("Phantom Fee Class");
>
> (4) late fees after the borrower's loan was accelerated, and where the accelerated loan was paid off (or foreclosed on) ("Post–Acceleration Late Fee Class"); and
>
> (5) amounts paid to Fidelity, a non-lawyer entity, from attorneys' fees charged to borrowers ("Fee–Split Class").[10]

---

9. Subgroup [3], which includes charges for attorneys' fees that were "improperly collected," also has a fail-safe definition issue. However, that fail-safe issue will be discussed in detail when that claim is analyzed in its entirety in Part III.B.1.

10. The classes have been reordered to facilitate a more orderly discussion of each potential class.

## B. RULE 23 ANALYSIS OF FIVE CLASSES

Each of the five classes must meet all of the requirements of Rule 23 to be certified. The defendants argue that, for various reasons, none of the proposed classes meets the requirements of Rule 23. Each of the class action claims shall be described in detail and analyzed in turn.

### 1. BREACH LETTER FEE CLASS

Mazzei's first purported class, the Breach Letter Fee Class, is defined to include all borrowers who were charged for attorneys' fees improperly collected from borrowers for issuance of breach letters by Moss Codilis during the Class Period.

Mazzei alleges that the Breach Letter Program was overseen by Christina Nash, an attorney not licensed to practice law in the state of Colorado. (Grobman Decl. Ex. BB at 15.) According to Mazzei, Nash's deposition testimony demonstrates that Nash was responsible for the "daily oversight of the breach letter program." (Grobman Decl. Ex. BB at 20). Therefore, because Nash was not licensed to practice law in Colorado, any "attorneys' fees" charged to Mazzei or members of the class for breach letters from Moss Codilis during Nash's tenure were allegedly improper. The defendants counter that at the time Mazzei's breach letter was written, the Breach Letter Program was under the supervision of Valerie Bromley, a Colorado licensed attorney, and not Christina Nash. (Dunnery Decl. Ex. L at 225–26.) The defendants claim that Valerie Bromley began supervising the Breach Letter Program in 1999, before Mazzei's letter was sent. (Dunnery Decl. ¶ 9(a).) The defendants further allege that specific language in Mazzei's breach letter was based on Bromley's work, demonstrating that his letter was prepared under the supervision of Bromley. (Dunnery Decl. Ex. L at 225–26.) Therefore, because Mazzei was charged a breach letter fee for a letter from a Colorado licensed attorney, his fee was proper.[11]

The defendants argue that the Breach Letter Fee Class should fail because Mazzei's breach letter was not written while Christina Nash was supervising the Breach Letter Program. Mazzei counters that his letter was written while Nash was still in charge. Whether it is labeled the failure to demonstrate typicality, adequacy, or an implied requirement of Rule 23(a), Mazzei has not successfully shown by a preponderance of the evidence that his letter was authored by Nash, and therefore this class fails. Furthermore, the individualized inquiry necessary for each class member's breach letter results in a failure of the commonality requirement as well as the predominance prong of Rule 23(b)(3).[12]

■ Mazzei must establish typicality, that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and adequacy, that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(3)–(4). Under both the typicality and adequacy prongs of Rule 23(a),

As discussed below, the plaintiff has failed to present sufficient evidence justifying certification of the first three classes, but has presented sufficient evidence supporting certification of the final two classes.

11. At argument, the plaintiffs conceded that Nash's involvement in the Breach Letter Program ended in November 2000, and therefore the class period for the Breach Letter Fee Class only extends from March 1, 2000 through November 1, 2000. However, the class period has no effect on the ability of the class to satisfy Rule 23.

12. The Breach Letter Fee Class also has a fail-safe class definition problem. Mazzei defines the Breach Letter Fee Class as all those charged for "[3] attorneys' fees *improperly collected* from bor-rowers for issuance of breach letters by [Moss Codilis]." (Pl.'s Mem. Supp. Class Certif. 1 (emphasis added).) At the merits phase of the litigation, Mazzei will have to establish that the fees were "improperly collected." Mazzei again seeks to identify membership by a successful outcome on the merits. Although courts have the discretion to alter the class definition, *see Campbell*, 269 F.R.D. at 73–74, redefinition would be difficult for this class because it would depend on an ability to determine the degree to which a licensed attorney was in fact involved in each of the breach letters. In any event, because the Breach Letter Fee Class fails for several reasons beyond the fail-safe definition, an exercise of discretion to redefine the class to avoid the fail-safe problem would be futile.

a purported class representative must have suffered the same injury as those people he or she seeks to represent. *See, e.g., Amchem,* 521 U.S. at 625–26, 117 S.Ct. 2231 ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.") (internal quotation marks and citation omitted); *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 293 (2d Cir.1999) (finding typicality if "the disputed issue of law or fact occup[ies] essentially the same degree of centrality to the named plaintiff['s] claim as to that of other members of the proposed class"); *Spagnola v. Chubb Corp.,* 264 F.R.D. 76, 96 (S.D.N.Y.2010) ("Plaintiffs seek to certify a class of individuals or entities who purchased their policies from 2000 to the present, but [the named plaintiff] purchased his policies in 1988 and 1999, and thus appears to fall outside of the very class definition he seeks to certify."). In addition to the explicit Rule 23(a) requirements, courts have implied the additional requirement that the class representative must be a member of that class. *See Feinstein v. Firestone Tire & Rubber Co.,* 535 F.Supp. 595, 600 (S.D.N.Y. 1982). Mazzei has not satisfied these requirements by a preponderance of the evidence. *See Teamsters,* 546 F.3d at 202.

 Mazzei has not shown that he is a member of the class because he has not demonstrated by a preponderance of the evidence that his breach letter was written under the supervision of Christina Nash. The evidence is, at best, ambiguous as to whether Christina Nash or Valerie Bromley supervised Mazzei's breach letter. Nash stated that she was probably the only attorney running the Breach Letter Program in 1997 and 1998, however, in 1999, Valerie Bromley began to work with her. (Grobman Decl. Ex. BB at 43–44.) Although Nash was referred to as "in-house counsel" in 1999 (Grobman Decl. Ex. BB at 19–20), Mazzei's letter was not sent until February 2000, when Bromley had been at Moss Codilis for several months. Furthermore, Nash testified at her deposition that a paragraph in the Mazzei letter was added to all form letters by Bromley (Dunnery Decl. Ex. L at 226), which indicates that at the point in time when Mazzei's letter was written, Bromley may have been in charge of the Breach Letter Program. Mazzei has not adduced sufficient evidence to demonstrate by a preponderance of the evidence that his breach letter was written by, or created under the supervision of, Christina Nash. Therefore, Mazzei has not satisfied typicality, adequacy, or the implied requirement that he is a member of the class he seeks to represent.

 Furthermore, even if Mazzei could ultimately demonstrate that Nash wrote or supervised the creation of his breach letter, Mazzei fails the typicality requirement because he is subject to the unique defense that Nash *may* not have written or supervised the creation of his breach letter. When the purported representatives may be "subject to unique defenses which threaten to become the focus of the litigation," posing a risk that "absent class members will suffer if their representative is preoccupied with defenses unique to it," class certification is inappropriate. *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990) (citations omitted). The unique defense does not have to be established in order to render the representative atypical; it is sufficient that the defendants show "that it is meritorious enough to require the plaintiff to devote considerable time to rebut [it]." *Lapin v. Goldman Sachs & Co.,* 254 F.R.D. 168, 179 (S.D.N.Y.2008) (quoting *Hallet v. Li & Fung, Ltd.,* No. 95 Civ. 8917, 1997 WL 621111, at *3 (S.D.N.Y. Oct. 6, 1997)). The defendants have demonstrated that even if Nash did actually write or supervise the writing of Mazzei's breach letter, there will be substantial litigation that focuses on whether Mazzei's letter was written by Nash or Bromley. This unnecessary litigation would distract from the claims of those class members whose letters were plainly written by Nash.

Mazzei countered at oral argument that there is no "unique defense" because if Nash did not write his letter, which was sent near the beginning of the Class Period, then Nash did not write any of the letters, and the entire class fails. Therefore, Mazzei argued, the defense that the letter was written by

Bromley is not unique, because it applies to every member of the class. However, Mazzei has not demonstrated that as of one specific date, all letters were switched from Bromley to Nash. In fact, it appears that there was overlap, because Bromley began working at Moss Codilis in 1999 but Nash continued to review breach letters through November 2000. (Grobman Decl. Ex. BB at 16; Dunnery Decl. ¶ 18(a).) The fact that each member of the class is potentially subject to his or her own "unique defense"—far from resolving all issues in favor of certification—only highlights the thousands of individualized inquiries the class requires. *See, e.g., Wu v. MAMSI Life & Health Ins. Co.,* 269 F.R.D. 554, 563–64 (D.Md.2010) (denying certification because "many of the proposed class claimants are subject to unique defenses ... the sole class representative[ ] is subject to several unique defenses that preclude a finding of typicality...."). Indeed, Mazzei's counter-argument to save typicality demonstrates why the class must fail the commonality prong of Rule 23(a) and the predominance requirement of Rule 23(b)(3).

 Mazzei cannot establish that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). To establish commonality, Mazzei must demonstrate that the class claims "depend upon a common contention" and that "common contention, moreover, must be of a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *See Dukes,* 131 S.Ct. at 2551. Here, the determination of the authorship of Mazzei's breach letter will not generate a common class-wide answer. Rather, each class member will have to demonstrate that his or her own letter was authored by Nash.

 Mazzei also cannot establish predominance, that "the questions of law or fact common to class members predominate over any questions affecting only individual mem-

bers." Fed.R.Civ.P. 23(b)(3). To satisfy the predominance requirement, the issues subject to generalized proof and applicable to the class as a whole must predominate over, and be more substantial than, the issues that are subject to individualized proof. *See In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 136 (2d Cir.2001), *abrogated on other grounds by In re IPO,* 471 F.3d at 24. The common question Mazzei highlights—whether Nash was engaged in the unauthorized practice of law—is straightforward and unlikely to take significant time to resolve. However, that inquiry pales in comparison to the individualized determinations that must be undertaken with respect to each class member's breach letter. Mazzei has not presented any evidence or explanation as to how breach letter identification could be resolved by generalized proof common to all class members. Instead, it appears that the fact-finder will have to analyze each breach letter to determine whether it was written under the supervision of Nash or Bromley. The difficulty of even determining the authorship of Mazzei's breach letter, when he is the named plaintiff and the litigation is over ten years old, presages the complex and unmanageable individualized inquiries that would be required if the class were certified.[13] Therefore, Mazzei has failed to demonstrate by a preponderance of the evidence that the Breach Letter Fee class satisfies Rule 23.

## 2. PENALTY FEE CLASS

Mazzei's next proposed class, the Penalty Fee Class, is defined to include all borrowers who, during the Class Period, were charged attorneys' fees and expenses which the defendants paid to Fidelity but which were paid back to the defendants by Fidelity as penalties from attorneys' fees which were not credited to borrowers. (Pl.'s Mem. Supp. Class Certif. 1.) Mazzei alleges that every borrower who paid attorneys' fees but whose completed bankruptcy or foreclosure went past the specified deadlines was improperly charged. The borrowers paid attorneys' fees

13. Although a full analysis is unnecessary because the class fails several Rule 23 elements, the complexity of the individualized inquiries demonstrates that the class action also likely fails the superiority prong of Rule 23(b)(3). *See Cohn v.* Mass. Mut. Life Ins. Co., 189 F.R.D. 209, 219 (D.Conn.1999) ("[T]he greater the number of individual issues, the less likely that superiority can be established") (internal quotation marks and citation omitted).

that were subsequently refunded to the defendants under the Bonus/Penalty Agreement, not paid to attorneys. The defendants allege that because Mazzei admits that a bankruptcy or foreclosure was never completed for his mortgage, there was no bonus or penalty paid in his case. (Dunnery Decl. ¶ 9(c)(ii).)

■■■ Just as with the Breach Letter Fee Class, Mazzei fails typicality, adequacy, and the implied requirement that the class representative be a member of the class. *See* *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231; *Caridad*, 191 F.3d at 293; *Spagnola*, 264 F.R.D. at 96; *Feinstein*, 535 F.Supp. at 600. The key fact to reach this conclusion is not in dispute: Mazzei did not have a completed foreclosure or bankruptcy. Mazzei paid off his loans in full and dismissed his own bankruptcy petition. Therefore, the Bonus/Penalty Agreement did not apply to Mazzei's loan and no attorneys' fees could have been refunded to the defendants for the legal work performed in connection with Mazzei's loan. The plaintiff has presented no evidence, much less a preponderance of the evidence, to show that Mazzei satisfies the Rule 23 requirements for this class. Because Mazzei would not benefit from a decision in favor of the class on this claim, he has no interest in litigating it successfully, and therefore he is an atypical and inadequate representative. Accordingly, the Penalty Fee Class does not satisfy the requirements of Rule 23.

### 3. PHANTOM FEE CLASS

Mazzei's next purported class, the Phantom Fee Class, includes all those charged attorneys' fees and expenses which the defendants never paid to Fidelity or their attorneys during the Class Period. (Pl.'s Mem. Supp. Class Certif. 1.) The "Phantom Fees" are attorneys' fees that Mazzei alleges the defendants' charged to borrowers, that the borrowers paid to the defendants, but that the defendants never subsequently paid to Fidelity. (Grobman Decl. ¶ 11; Dunnery Decl. ¶ 9(c).)

Mazzei's evidence for the Phantom Fees are Fidelity invoices produced during discovery in this litigation and in a related suit, *Vincent v. Money Store*, No. 03 Civ. 2876. The invoices have a section titled "Invoice Processing Summary," with various fields for the entry of dates, including "Date Submitted," "Accepted," "Approved," "Check Requested," and "Check Confirmed." (Grobman Decl. Ex. G at 7–12.) A date entered under "Check Confirmed" is confirmation that a check has been sent to Fidelity. (Grobman Decl. Ex. A at 516.) None of Mazzei's Fidelity invoices have a date under "Check Confirmed." (Grobman Decl. Ex. G. at 7–12.) Instead, each invoice has the word "Unavailable" under "Check Confirmed." (*See* Grobman Decl. Ex. G. at 7–12.) Mazzei alleges that the lack of a date under "Check Confirmed" is proof that he was charged for attorneys' fees that were never actually paid to Fidelity. Mazzei made discovery requests for evidence from the defendants that the "attorneys' fees" in the invoices had actually been paid to attorneys.[14] No documents were produced.

Although Mazzei does not allege that the defendants had a "policy" of charging Phantom Fees, he does claim that other members of the class were charged Phantom Fees. Specifically, Mazzei points to the Fidelity invoices of the four plaintiffs in *Vincent v. Money Store*, No. 03 Civ. 2876. (Pl.'s Mem. Supp. Class Certif. 11–13.) Although none of the *Vincent* plaintiffs' invoices were marked "Unavailable" under "Check Confirmed," their invoices did have other anomalies. Nine of the invoices were blank under "Check Confirmed," while six had dates listed that were one to three years after the plaintiffs were charged for and paid the fees. (Grobman Decl. ¶ 14; Grobman Decl. Ex. M.) According to Mazzei, the evidence indicates that not only were the *Vincent* plaintiffs charged for Phantom Fees, but also that because nearly all of the invoices in such a small sample size had some anomalies, it can be inferred that the defendants regularly

---

14. Specifically, Mazzei requested "[a]ll documents concerning the 'Foreclosure Attorney/Court Costs' of $1,299.27 ... including, but not limited to, any correspondence, breakdown of fees, time sheets, bills and/or invoices from counsel, or proof of payment by defendants." (Grobman Decl. Ex. O at ¶ 18.)

charged Phantom Fees to a large number of borrowers.

The defendants allege that they had a policy *not* to bill borrowers for attorneys' fees until a check had been sent to Fidelity. (Dunnery Decl. ¶ 9(c)(i).) Therefore, the defendants argue, even if Mazzei was accidentally charged fees that were never paid to attorneys, it is unlikely that anyone else was. (Dunnery Decl. ¶ 9(c)(i).) The defendants also claim that the word "Unavailable" or a blank space does not mean that the fee was not actually paid to Fidelity (Dunnery Decl. ¶ 18(c)),[15] and that the incorrect designation on the computer system could be the result of input errors by clerical personnel (Dunnery Decl. ¶ 17).[16]

■■■■ Mazzei has not demonstrated by a preponderance of the evidence that the Phantom Fee Class satisfies the requirements of Rule 23. Mazzei has failed to demonstrate that the class satisfies the commonality requirement. There is no "common contention . . . capable of class wide resolution." *Dukes*, 131 S.Ct. at 2551. Mazzei does not offer any proof, or even allege, that the defendants had a policy of charging borrowers for fees that were not paid to Fidelity. Therefore, Mazzei cannot resolve the Phantom Fee question with common proof that would apply to the entire class. The failure of commonality is best illustrated by Mazzei and the *Vincent* plaintiffs. Even if Mazzei could prove that he had been charged for attorneys' fees that were never paid to Fidelity, that proof would have no bearing on whether the *Vincent* plaintiffs had been similarly charged for Phantom Fees. Mazzei

could not rely on the "Unavailable" designation because the *Vincent* plaintiffs' invoices did not even say "Unavailable." [17] Mazzei would have to demonstrate that each *Vincent* plaintiff, and each member of the class, had paid fees that were not subsequently paid to attorneys.

■■■■ Mazzei's unique facts, including his invoice listing of "Unavailable" under "Check Confirmed," render him an atypical and inadequate class representative of the Phantom Fee Class. Typicality is satisfied when "each class member's claim arises from the same course of events." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997) (per curiam) (citation omitted). To establish adequacy of representation, "[t]he representatives and the class members must share common objectives and legal or factual positions. . . ." *M.O.C.H.A. Society, Inc. v. City of Buffalo*, No. 98 Civ. 99C, 2008 WL 343011, at *5 (W.D.N.Y. Feb. 6, 2008) (quoting 7A Wright, Miller & Kane Fed. Prac. and Proc. Civ. § 1769 (3d ed. 2007)). Mazzei's invoices indicate a date of "Unavailable," while invoices for other potential class members are either correct, blank, or dated years after the legal services supposedly were rendered. Each of these factual scenarios requires different proof. For Mazzei's claim to succeed, he must show that "Unavailable" means the fee was never paid to attorneys. By contrast, for the *Vincent* plaintiffs' claims to succeed, Mazzei must show that a blank under "Check Confirmed" or a long delay between the date of a charge and the date of payment is proof that the fees were never paid by the defendants. Because Mazzei's

---

15. "[T]he investigation would require a separate review . . . for each relevant individual loan to determine whether or not a check was actually sent to pay for the legal services for that loan, regardless of the gap in the information on the face of the 'Fidelity invoice' concerning the 'check confirmed' date." (Dunnery Decl. ¶ 18(c).)

16. The defendants also claim that Mazzei has shown no other borrower who had "Unavailable" under "Check Confirmed." This argument is essentially one of numerosity, that Mazzei has failed to demonstrate that there are other members of the class. However, the defendants stipulated to numerosity. (*See* Grobman Decl. Exs. KK, LL.) Therefore, the defendants, having so

stipulated, cannot raise the failure to demonstrate numerosity as a hurdle to class certification, even under the guise of typicality or adequacy.

17. Mazzei does not purport to represent a class of only those whose invoices stated "Unavailable." However, even if Mazzei's proposed class were redefined to include only those class members whose invoices stated "Unavailable" under "Check Confirmed," absent proof of a common policy by the defendants, such a class would still fail for lack of predominant common questions. Without a common policy, there would remain the possibility for each purported class member, the fees were paid but the "Unavailable" designation was the result of a clerical error.

claim will be successful without offering any of the proof required for the *Vincent* plaintiffs' success, Mazzei has no incentive to litigate their factual positions, let alone those of other class members with a myriad of scenarios that are as yet unknown. Mazzei's interests are not coextensive with the class, and his injuries are dissimilar from those of other class members; therefore, Mazzei fails typicality and adequacy as well.

 The plethora of individual inquiries that undercut commonality, typicality, and adequacy also doom predominance. *See In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 309 (S.D.N.Y.2004) ("[A] court must deny certification where individual issues of fact abound.") (citations omitted). There is one question common to all potential members of the Phantom Fee Class: whether the charging of fees that were never actually paid to attorneys violated the form loan agreement. In contrast, the non-common questions—whether each individual member was charged fees that were never paid, and whether each specific designation on the Fidelity invoices indicates attorneys' fees that were not paid—will undoubtedly be the focus of the litigation. *Cf. Spagnola*, 264 F.R.D. at 98 (predominance "requires that *common* questions be the focus of the litigation") (emphasis added). Even for those class members that may share Mazzei's "Unavailable" invoice designation, it would still have to be demonstrated that, for each individual, the attorneys' fees were actually charged to the plaintiff and were not actually paid to Fidelity or to the corresponding law firm. These questions are not susceptible of common proof. *See, e.g., Wilborn v. Wells Fargo Bank, N.A. ("In re Wilborn")*, 609 F.3d 748, 755–56 (5th Cir.2010) (denying class certification because, among other reasons, the highly individualized inquiries regarding the types of attorneys' fees charged and "whether [the] fees were actually imposed or merely recorded on internal records"); *Klay v. Hu-*

*mana, Inc.*, 382 F.3d 1241, 1264 (11th Cir. 2004); *Weiss*, 226 F.R.D. at 452 ("Because members of the proposed class allege that their insurance policies were breached in a 'variety of ways,' each type of breach would require a different factual showing.").

Moreover, the class also fails predominance because of the likelihood of individualized defenses for each class member. *See Wilborn*, 609 F.3d at 756. In *Wilborn*, the Fifth Circuit Court of Appeals noted that even if all members of a purported class were incorrectly charged the same improper attorneys' fees under their mortgage loan agreements, common questions would still not predominate because the defendant may have viable defenses to some of the class members' claims, such as waiver or estoppel. *Id.* In this case, the defendants could also have similar individual affirmative defenses for each class member. All of these individualized inquiries demonstrate that Mazzei has failed to prove by a preponderance of the evidence that common questions predominate. Therefore, the Phantom Fee Class does not satisfy the requirements for class certification.

### 4. FEE–SPLIT CLASS

The next class Mazzei seeks to certify, the Fee–Split Class, includes all borrowers charged for amounts paid to Fidelity, a non-lawyer entity, from attorneys' fees charged to borrowers during the Class Period. (Pl.'s Mem. Supp. Class Certif. 1.) The defendants outsourced their bankruptcy and foreclosure legal work to Fidelity, which passed the work on to law firms throughout the nation. Mazzei alleges that the "technology and referral fee" law firms paid to Fidelity was illegal fee-splitting between a law firm and a non-legal entity.[18] Mazzei argues that because such fee-splitting is prohibited by the laws of all fifty states, the defendants' charges for such fees violated the form loan agreement provision prohibiting fees in violation of "applica-

---

18. Mazzei was also charged a $50 "outsource management fee." (Grobman Decl. Ex. H at 15; Grobman Decl. Ex. Q at 6.) The defendants paid the outsource management fee to Fidelity when Fidelity took over a matter from a previous outsourcer. (Grobman Decl. Ex. A at 453.) The defendants have alleged that the borrower was never meant to incur the fee and the charge to Mazzei was a clerical error. (Grobman Decl. Ex. Q at 6.) Regardless of the charge for the outsource management fee, because Mazzei's loan was referred to Fidelity, which then received a "technology and referral fee" for Mazzei's loan, Mazzei is typical of the class.

ble law." (Grobman Decl. Ex. B at ¶ 4(D).) The defendants allege that the arrangement between the Fidelity and the law firms was not illegal fee-splitting.

The defendants only contest the Fee–Split Class on grounds of a lack of typicality, adequacy, and predominance. The defendants argue that Mazzei is atypical and inadequate because he has not shown that he was charged fees that were split. The defendants also argue that common questions do not predominate because variances in state laws on unlawful fee-splitting, as well as the agreements between Fidelity and its network of hundreds of law firms, call for individualized inquiries. However, the Fee–Split Class satisfies all of the elements of Rule 23 and may be certified as a class action.

The class satisfies commonality.[19] Unlike the classes Mazzei proposed that have been discussed above, the central issue for this class—whether the arrangement among the defendants, Fidelity, and Fidelity's network of firms was improper—is capable of class-wide resolution. *See Dukes*, 131 S.Ct. at 2551. It will have to be determined, whether, as a matter of fact or law, the arrangement amounted to unlawful fee-splitting and, if it did, whether such fee-splitting violated the form loan agreement. A determination that the arrangement was unlawful and in violation of the form loan agreement will render the defendants liable to all members of the class who were charged such fees without further inquiry.

The defendants argue that Mazzei is an atypical and inadequate class representative because he has shown no evidence that his fees were split between Fidelity and a law firm. The defendants' argument misses the crux of Mazzei's fee-splitting claim—namely, that everyone whose loan was referred to Fidelity, including Mazzei, was subject to unlawful fee-splitting. Fidelity charged attorneys representing the defen-

dants a "technology and referral" fee on each case Fidelity referred. (Green Decl. ¶ 15 (citing Grobman Decl. Ex. K at 417); Dunnery Decl. ¶¶ 9(c)(iii), 18(e).) That payment would be made "by the law firm upon the referral of the case." (Dunnery Decl. ¶ 9(c)(iii).) The "technology and referral fee" paid by the law firms was included in the amount that Fidelity calculated for the Fannie Mae allowable limits on legal fees for bankruptcy and foreclosure actions, (Grobman Decl. Ex. K at 417), and was passed on to borrowers as attorneys' fees, without any indication that it actually was paid to Fidelity, a non-legal entity, (Green Decl. ¶¶ 15, 18 (citing Grobman Decl. Ex. G at 3, 11)). Because Mazzei's loan, like the loans of all borrowers in default, was referred to a law firm by Fidelity, his loan was subject to the "technology and referral fee," which he now claims was improper. Mazzei satisfies both typicality and adequacy.

To qualify as a typical and adequate class representative, Mazzei must "be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem*, 521 U.S. at 625–26, 117 S.Ct. 2231 (citation omitted); *see also Caridad*, 191 F.3d at 293. Mazzei's fee-splitting claim will succeed or fail in tandem with the claims of other members of the class. Fidelity referred loans from the defendants to law firms in its network in exchange for a "technology and referral fee." (Green Decl. ¶ 15 (citing Grobman Decl. Ex. K at 417); Dunnery Decl. ¶¶ 9(c)(iii), 18(e).) The defendants have not disputed that Mazzei's loan was referred to a law firm by Fidelity, and was one for which Fidelity received a "technology and referral fee." (Green Decl. ¶¶ 15, 18.) Under Mazzei's theory of the defendants' liability, he was charged for fees that were split between Fidelity and a law firm via the "technology and referral fee." Whether the defendants are actually liable is an issue to be determined on a class wide basis and need not be resolved on this motion for class certification.

---

19. Although the defendants stipulated to numerosity, (Grobman Decl. Exs. KK, LL), the Fee–Split Class clearly satisfies the requirement that "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Courts generally find numerosity satisfied when a class has forty or more members.

*Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y.1998) (collecting cases). As of July 2005, the defendants had referred over 46,000 loans to Fidelity for foreclosure and bankruptcy matters. (Grobman Decl. Ex. Q at 9.) Therefore, the numerosity requirement is met easily for the Fee–Split Class.

However, if the defendants are liable then all members of the class, including Mazzei, are entitled to relief.

The defendants also argue that Mazzei is atypical because he does not have a breach of contract claim against The Money Store. The defendants claim that The Money Store assigned Mazzei's loan to The Bank of New York in 1994, and this assignment relieved them of liability on the contract.[20] The plaintiff counters, correctly, that this argument is waived. Absent a novation, the defendants, as assignors, remain jointly liable on the contract with The Bank of New York, the assignee. *See Baer v. Associated Life Ins. Co.*, 202 Cal.App.3d 117, 248 Cal.Rptr. 236, 239 (1988).[21] Therefore, the defendants necessarily argue that there has been a novation, however, "[n]ovation is an affirmative defense that is waived if not specifically [pleaded]." *Heavenly Ham Co. v. HBH Franchise Co.*, No. 04 C 2577, 2005 WL 331558, at *5 (N.D.Ill. Feb. 7, 2005) (citations omitted). Because the defendants failed to raise the novation argument in their pleadings or at any time prior to their brief in opposition to class certification, the affirmative defense is waived. *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 526 (2d Cir.2004) ("Generally a failure to plead an affirmative defense results in a waiver.") (internal quotation marks and citation omitted). Therefore, the defendants have waived their novation argument against Mazzei's status as a typical and adequate class representative.[22]

The Fee–Splitting Class also satisfies the Rule 23(b)(3) requirements of predominance and superiority. Mazzei has demonstrated that common questions predominate over and are more substantial than the issues that are subject to individualized proof. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 136. The common questions, whether the arrangement violated ethics laws on fee-splitting and the form loan agreement, are the only inquiries required for a finding that the defendants are liable. Unlike the Phantom Fee Class or the Breach Letter Fee Class, there are no individualized issues for each class member as to whether they were charged the fee and what the nature of the fee was. Fidelity was allegedly paid the "technology and referral fee" for every loan that was outsourced to a law firm. The law firms then allegedly passed on the "technology and referral fee[]" to borrowers as part of "attorneys' fees." The defendants have not introduced any evidence that would require individual hearings or substantial time devoted to the unique facts relating to individual class members.

The defendants argue that because Fidelity had different agreements with hundreds of law firms, individualized analysis of the agreements will be required. The defendants' contention is misguided because the analysis of the agreements between Fidelity and its network of law firms is not necessary to establish the defendants' liability. Fidelity did not provide the technology and referral service to law firms for free; regardless

**20.** The defendants argue that the assignment to The Bank of New York defeated all of Mazzei's claims on grounds of a lack of typicality. Because Mazzei's other class claims considered above failed to satisfy the Rule 23 requirements, it was unnecessary to consider this argument for those claims. However, because the argument is waived, the fact that Mazzei's loan was assigned to The Bank of New York would not, in itself, have defeated certification for any of the class claims discussed above.

**21.** The defendants cite California law for their argument that the defendants ceased to have a contractual relationship with the plaintiff after the assignment. The loan documents relate to a loan made to a California resident secured by a mortgage on California property. There is no reason to question that California law applies to

the issue of assignment or novation. The parties have cited California law on this issue and the Court can accept the parties' assumption that California law applies. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir.2000) ("The parties' briefs assume that New York law controls, and such implied consent ... is sufficient to establish choice of law.") (internal quotation marks and citation omitted).

**22.** There would also be reason to question the merits of the defendants' argument. The defendants point to language in the Deed of Trust that provides: "The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower...." (Grobman Decl. Ex. C at § 11.) While this language purports to bind assignees, it does not release assignors of any liabilities.

of the specifics, because Fidelity received a fee from every firm for each loan referred, inquiry into each agreement is not necessary to determine liability. Although investigation into the individual fee-split agreements may be necessary for calculations of damages, because Fidelity may have had different fee-splits with each law firm, "it is settled in this Circuit that factual differences in the amount of damages ... will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class." *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y.1998) (citing *Green v. Wolf*, 406 F.2d 291, 299–301 (2d Cir.1968)); *see also In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 385 n. 133 (S.D.N.Y. 2010) (collecting cases).

 The defendants also argue that the variety in state ethics laws defeats predominance. "[I]f a claim is based on a principle of law that is uniform among the states, class certification is a realistic possibility." *Klay*, 382 F.3d at 1262; *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 77 (E.D.N.Y. 2004) ("A claim or defense can implicate common issues and be litigated collectively, despite the existence of state law variations, so long as the elements of the claim or defense are substantially similar ....") (internal quotation marks and citation omitted). The plaintiff bears the burden of showing, through an "analysis of state law variations," that such variations do not "swamp any common issues." *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. at 312. Here, Mazzei has demonstrated that the Fee–Split Class claim is based on substantially uniform principles of state law.

 Mazzei's claim relies on principles of state ethics laws prohibiting the splitting of fees between lawyers and non-lawyers. The plaintiff's argument is that under the ethics rules that prevail throughout the nation, the attorneys hired by Fidelity could not ethically pay part of their attorneys' fees to Fidelity and that it was a breach of the form loan agreement to include such payments as part of the attorneys' fees charged to the borrowers. The plaintiff's expert on state ethics laws, Bruce Green, is a law professor at Fordham University School of Law and the director of the school's Center for Law and Ethics. Professor Green has produced persuasive evidence that the relevant law on fee splitting is identical in all material respects throughout the fifty states. (Green Decl. ¶ 21 ("The sharing of legal fees between lawyers and non-lawyers is expressly forbidden by the rules of professional conduct in all 50 states and the District of Columbia.... [V]ariations are immaterial to this lawsuit.").) While the defendants question Professor Green's opinion, they have presented no countervailing evidence to suggest that the Fidelity arrangement was consistent with the ethics rules of any state. Professor Green's credible and thorough report demonstrates that state ethics rules do not defeat predominance for the Fee–Split Class. Therefore, common questions predominate.

 The class action is also "superior to other available methods for fairly and efficiently adjudicating the controversy" for the Fee–Split Class. Fed.R.Civ.P. 23(b)(3). The factors considered in determining superiority are: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.* These factors all militate toward certification of the Fee–Split Class.

The class members have little interest in controlling the litigation individually. Each of the class member's claims is for such a minimal recovery that proceeding individually would be prohibitively expensive. *See Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir.2010) (noting that "In such circumstances [of small recoveries], the class action device is frequently superior to individual actions."). Furthermore, the parties have not introduced evidence that other class members have brought litigation elsewhere. The absence of such suits indicates a lack of individual interest in controlling the litigation. *See Dungan v. Acad. at Ivy Ridge*, 249 F.R.D. 413, 427 (N.D.N.Y.2008).

Moreover, "[t]rying this action collectively allows for a more cost-efficient and fair litigation of common disputes than requiring each plaintiff to prosecute his or her own individual action." *Garcia v. Pancho Villa's of Huntington Vill., Inc.*, 281 F.R.D. 100, 107 (E.D.N.Y.2011) (internal quotation marks and citation omitted). The common liability questions for the Fee–Split Class make class-wide adjudication more efficient and desirable. Furthermore, class certification will preclude inconsistent rulings that would, in the absence of class-wide adjudication, expose the defendants to potentially inconsistent decisions. *See Carpenter v. Hall*, 311 F.Supp. 1099, 1112 (S.D.Tex.1970). And finally, the relative absence of individual inquiries for liability also demonstrates that there will be little difficulty in managing the class action. *Augustin v. Jablonsky*, 461 F.3d 219, 230 (2d Cir.2006). Accordingly, the Fee–Split Class may be certified under Rule 23.

### 5. POST–ACCELERATION LATE FEE CLASS

The Post–Acceleration Late Fee Class, as defined by Mazzei, includes every borrower who was charged late fees after the borrower's loan was accelerated, and where the accelerated loan was paid off (or foreclosed on) during the Class Period. (Pl.'s Mem. Supp. Class Certif. 1.) Mazzei alleges that it was the regular practice of the defendants to charge late fees after acceleration. He argues that such late fees violated the form loan agreement because there was no provision allowing them, and therefore the contract implicitly prohibited them. The defendants claim that although Mazzei may have been charged post-acceleration late fees improperly, few others were.[23] The defendants further allege that it was their regular practice *not* to collect late fees after acceleration when the borrower's loan was in foreclosure, and that they conducted regular compliance reviews to assure late fees after acceleration were only charged in those states where the form loan agreement had not been interpreted to prohibit such charges. (Dunnery Decl.

¶ 9(b); Dunnery Decl. Ex. N at 186–88; Dunnery Decl. Ex. O at 355–56.)

At the outset, the class definition must be altered to eliminate typicality, adequacy, and predominance problems caused by the inclusion of loans that were "foreclosed on" in the class definition. Mazzei's loan was not foreclosed on, and this dissimilarity in facts between Mazzei and the class makes Mazzei an atypical and inadequate class representative for the "foreclosed on" class members. *See Amchem*, 521 U.S. at 625, 117 S.Ct. 2231; *Caridad*, 191 F.3d at 293; *Spagnola*, 264 F.R.D. at 96; *Feinstein*, 535 F.Supp. at 600. The "foreclosed on" portion of the class also fails the predominance requirement because Mazzei has not demonstrated that it was the regular practice of the defendants to charge late fees after acceleration when a loan was foreclosed on. The defendants have provided evidence that they had a policy not to charge late fees after acceleration for loans that were foreclosed on. (Dunnery Decl. Ex. N at 186–88.) Mazzei has not produced any evidence to contradict the defendants' proof that there was no common policy to charge such fees. Therefore, without a common policy, the plaintiff has not shown by a preponderance of the evidence that the foreclosure portion of the class would require anything less than a loan-by-loan analysis. Removing the "(or foreclosed on)" language from the class definition can remedy these failings. *See Cokely*, 2004 WL 1152531, at *2 n. 3.

■■■■ Mazzei has demonstrated that the Post–Acceleration Late Fee Class satisfies all of the Rule 23(a) requirements. The common question capable of class-wide resolution is whether, when the loan was subsequently paid off, the defendants were prohibited under the form loan agreement from charging late fees after acceleration. If such fees were prohibited, then any class member charged these fees was charged in breach of the form loan agreement. Mazzei paid off his loan, and the pay-off amount included charges for late fees after acceleration. Therefore, Mazzei is a typical and adequate class representative.

---

23. As explained with regard to the Phantom Fee Class, to the extent the defendants argue against typicality on the grounds that Mazzei has not shown other affected class members, this argument is waived because the defendants stipulated to numerosity.

■ The class also satisfies the requirements of Rule 23(b)(3). The defendants only contest the class on three grounds, each attacking the predominance of common questions. Because the plaintiff has shown that the defendants had a common policy of charging late fees after acceleration, and because contract law is sufficiently uniform to interpret the form loan agreement, none of the defendants' arguments defeat class certification.

The defendants argue that because Mazzei has not demonstrated that the defendants had a policy of charging late fees after acceleration, inquiries into each loan will be necessary to determine if such fees were charged. To succeed, Mazzei must demonstrate that there was a "policy" of charging Post–Acceleration Late Fees. *See, e.g., Smilow v. Southwestern Bell Mobile Sys.,* 323 F.3d 32, 36, 39–42 (1st Cir.2003) (holding that class could proceed despite differences within the class because the plaintiffs alleged systematic overcharging by a cell phone company); *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.,* 121 F.R.D. 664, 669 (N.D.Ill.1988) ("Since plaintiffs' claims arise from allegations of common practice and rights derived from form contracts, the case appears to present the classic case for treatment as a class action.") (internal quotation marks and citation omitted). Without a policy, adjudication would require individual investigation for each loan, and certification would likely be denied because of a lack of predominance. *See Weiss,* 226 F.R.D. at 451 (holding different types of breaches required individual investigation defeating predominance).

The plaintiff's evidence is sufficient to meet his burden of demonstrating that the defendants had a policy of charging post-acceleration late fees. The defendants' witness testified that in states where state law did not prohibit late fees after acceleration of the loans, the defendants would charge such fees. (*See, e.g.,* Grobman Decl. Ex. A at 355–64; Grobman Decl. Ex. MM at 168–69; Dunnery Decl. Ex. N at 172, 186.) The defendants argue that this policy of compliance with state laws demonstrates it did not have a policy of violating state laws. However, Mazzei argues that these fees were prohibit-

ed under the *form loan agreement,* not state law, and notwithstanding state laws that had not barred such fees. Therefore, the defendants' policy to charge fees except where prohibited by state law potentially conflicts with the plaintiff's proffered interpretation of the form loan agreement. The defendants' policy of compliance, as construed by Mazzei, was a policy of systematically violating the form loan agreement in the states where the defendants had determined that there was no specific state law or court decision that prohibited such fees.

■ The defendants also claim that variations in state laws prevent a finding of predominance, while Mazzei argues that state contract law uniformly forbids post-acceleration late fees. Mazzei has met his burden of demonstrating that state contract law is sufficiently uniform to allow for class-wide adjudication. *See Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. at 303. The interpretation of uniform contracts, such as the form loan agreement, is well suited for treatment as a class action. *See, e.g., Wu v. Pearson Educ., Inc.,* 277 F.R.D. 255, 265 (S.D.N.Y.2011); *Farinella v. PayPal, Inc.,* 611 F.Supp.2d 250, 263 (E.D.N.Y.2009) ("differences in state contract law do not defeat the predominance prong"); *Steinberg,* 224 F.R.D. at 74 ("[C]laims arising from interpretations of a form contract appear to present the classic case for treatment as a class action...."). Furthermore, Mazzei cites to cases in twelve states that have all held that absent a specific contract provision to the contrary, late fees may not be charged post-acceleration. The defendants have not pointed to any provision of the form loan agreement that specifically authorized late fees following acceleration of the loan. Although the defendants argue that twelve states are insufficient to prove national uniformity, the defendants do not produce a single case or statute in which a state has upheld or allowed a late fee after acceleration where a contract does not expressly provide for such a fee.

The defendants also argue that Florida contract law is unusual because it has a "materiality" requirement. Although the defendants identify one case in which Florida's

"materiality" requirement was sufficient to defeat predominance, *see Marino v. Home Depot U.S.A., Inc.,* 245 F.R.D. 729, 734 (S.D.Fla.2007), the settled law in the Second Circuit is that contract law is sufficiently uniform for class treatment, notwithstanding Florida's materiality requirement. *See, e.g., Wu,* 277 F.R.D. at 265; *Spagnola,* 264 F.R.D. at 98; *Steinberg,* 224 F.R.D. at 74. Moreover, *Marino,* on which the defendants rely, is distinguishable from this case. In *Marino,* each class member was subject to completely unique individual treatment that would have required the Court to analyze each claim for whether the breach was "material." 245 F.R.D. at 734. By contrast, in this case, the provisions for late fees were standardized in form loan agreements. In any event, if determining materiality becomes a significant individualized issue during the course of the litigation, the class could then be redefined to exclude Florida class members.

The defendants also argue that even if contract law is uniform, the possibility that the defense of the "voluntary payment doctrine" could apply to class member should defeat predominance. The plaintiff responds that the possibility of an individualized affirmative defense is insufficient to defeat certification, and furthermore that the voluntary payment doctrine is inapplicable to the class. The voluntary payment doctrine will not bar certification of the class.

■■■ While the existence of individualized defenses can overcome predominance and defeat a motion for class certification, "the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *Dupler v. Costco Wholesale Corp.,* 249 F.R.D. 29, 45 (E.D.N.Y.2008) (quoting *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d at 139, 149) (internal quotations omitted). "[A]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application of [a defense] will not automatically foreclose class certification under Rule 23(b)(3)." *Id.* The voluntary payment doctrine "bars recovery of payments voluntarily made with full knowledge of the facts." *Id.* (internal quotation marks and citations omitted). However, "[i]t is not the law that any time a voluntary payment doctrine issue is raised that certification must be denied. Such an absolute rule would bar almost all class actions involving alleged nondisclosures (even in standard form contracts) because there is always the possibility that a particular plaintiff, despite a nondisclosure by the defendant, somehow stumbled upon the nondisclosed fact at issue on his or her own and continued to make payments. Instead, the [C]ourt must examine in each particular case how the voluntary payment doctrine issue may impact the common issues of law and fact." *Id.* at 45.

■■■ Upon examination, it is apparent that the defendants have done nothing beyond raise the specter of the voluntary payment doctrine in a footnote; their argument is pure speculation. The defendants have not shown a single class member that may potentially be subject to the voluntary payment doctrine. *Cf. Dillon v. U–A Columbia Cablevision of Westchester, Inc.,* 100 N.Y.2d 525, 760 N.Y.S.2d 726, 790 N.E.2d 1155, 1156 (2003) (dismissing class action complaint because the named plaintiff was subject to the voluntary payment doctrine because she knew she would be charged the late fee at issue). Furthermore, whether the voluntary payment doctrine applies to any members of the class is a common issue, not an individualized issue, because the plaintiff argues that the affirmative defense cannot apply to any of the class members. *See Miller v. Optimum Choice, Inc.,* No. DKC 2003 3653, 2006 WL 2130640, at *7 (D.Md. July 28, 2006) ("Because the affirmative defenses are common across the putative class members, the defenses would not operate to destroy the predominance of common questions across the class, but would instead provide an additional link of commonality between the class members."). Mazzei argues that the voluntary payment doctrine is inapplicable to the entire class for two reasons. First, the doctrine is inapplicable when the payments were made under the threat of loss of property, as they were to each class member who defaulted on that borrower's home loan. *See Best*

*Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. 05 2310, 2010 WL 4628548, at. *3 (D.Minn. Nov. 4, 2010) (collecting cases). Second, the form loan agreement provides that the defendants must refund any unpermitted fees (Grobman Decl. Ex. C at ¶ 12), which thereby expressly contracts around the voluntary payment doctrine. *See Best Buy Stores, L.P.*, 2010 WL 4628548, at *2 (voluntary payment doctrine does not apply when "the parties have expressly contracted for repayment of excess funds"). Each counterargument by Mazzei applies equally to every member of the class.

Although the validity of Mazzei's arguments need not be resolved at this time, if Mazzei is correct on either ground, the resolution of the voluntary payment defense will affect every member of the class. Resolving the application of the voluntary payment doctrine as a common issue will be more efficient, not less. Therefore, the voluntary payment defense will not defeat predominance.

The plaintiff has demonstrated that common questions predominate. Furthermore, for the same reasons discussed with respect to the Fee–Split Class, a class action is superior to other methods of adjudication. The plaintiff has met his burden of demonstrating by a preponderance of the evidence that the Post–Acceleration Late Fee Class satisfies all of the requirements of Rule 23(a) and Rule 23(b)(3). Accordingly, the class should be certified as a class action.

### IV. THREE ADDITIONAL SUBCLASSES

Mazzei also moves for the certification of three additional subclasses:

(1) All those borrowers who, "but for the overcharges described in the Class as certified, would have had a 'credit balance' under § 1666d of TILA." (Pl.'s Mot. Supp. Class Certif. 2.)

(2) "California borrowers whose loans were serviced by [the defendants] and who, after March 2000, were charged ... any of the fees or expenses set forth in the general Class Definition." (Pl.'s Mot. Supp. Class Certif. 25.)

(3) "California borrowers whose loans were serviced by [the defendants] and who, after March 2000, were charged ... fees which are not included among those allowed to be charged under Cal. Civil Code 2924c after a Notice of Default was recorded." (Pl.'s Mot. Supp. Class Certif. 25.)

Mazzei has hardly argued in support of these subclasses and has not demonstrated his compliance with Rule 23 by a preponderance of the evidence for any of them. *See Dukes*, 131 S.Ct. at 2551; *Teamsters*, 546 F.3d at 202. Mazzei has not provided evidence that he is a member of these classes, typical of the classes, or an adequate class representative under Rule 23(a). He has adduced no common questions, nor even attempted to demonstrate the Rule 23(b)(3) requirements of predominance or superiority. He has referred to these subclasses in his brief without any effort to demonstrate that the requirements of Rule 23 are satisfied. Moreover, Mazzei did not reply to the defendants' argument against these classes, instead focusing on the classes discussed above and abandoning these class claims. As to each of these subclasses the motion for class certification is therefore denied.

### CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the plaintiff's motion for class certification pursuant to Rule 23(a) and (b)(3) is **denied in part and granted in part**. The plaintiff is directed to submit a proposed order certifying the Fee–Split Class and the Post–Acceleration Late Fee Class by **January 7, 2013**. The defendants may submit any objections and counter-order by **January 14, 2013**. **The Clerk of Court is directed to close docket nos. 158 and 164.**

**SO ORDERED.**